PHILLIP GETTYS v. AMERICAN CAR & FOUNDRY COMPANY and EDDIE JACKSON, Appellants.—16 S. W. (2d) 85.

Division Two, April 5, 1929.

788

*Watts & Gentry* for appellants; *G. A. Orth* of counsel.

*Mark D. Eagleton* and *Hensley, Allen & Marsalek* for respondent.

792

DAVIS, C.—This is an action for personal injuries. While the verdict of the jury was $25,000, the trial court required, as a condition to overruling defendants' separate motions for a new trial, plaintiff to remit $10,000, which was accordingly done. From a judgment for $15,000 against them, defendants appealed.

The evidence adduced by plaintiff warrants the finding that defendant, American Car & Foundry Company, hereinafter designated "corporation," was operating a plant in the city of St. Louis, building freight cars; and that defendant Jackson was in its employ, and, at the time of plaintiff's injury, he was handling and operating a reamer in the construction of a certain steel box car. Plaintiff at the same time was driving rivets with a pneumatic hammer. Another reamer and another riveter were also working on the same car. The reamers, which we understand to be drills, were electrical devices suspended from an overhead truck which moved on a track comprised of rails, twelve to sixteen feet apart. The box car on which they were working was situated north and south, and was then at what was known as the fourth position, with sides thereon, but without a floor. Through the center of the car ran two center sills. On top of them there was placed what is known as a cover plate, about thirty inches wide and extending the length of the car. The cover plate was a thin sheet of steel. It was in this cover plate that Jackson was reaming holes. Jackson began reaming holes on this car at the south end and plaintiff driving rivets at the north, and each progressed in their work toward the center of the car. If their work thus continued, they would eventually pass or come opposite each other. Plaintiff was working on the west side of the car, riveting the track on which the door would run. The car was eight feet wide, and we deduce from the evidence that the space in which plaintiff was working extended from the west side of the cover plate to the west side of the car, a distance of about two and a half feet between them. The holes reamed were approximately three inches apart. The pneumatic hammer created a noise, while the reamer, in use, was practically noiseless.

Plaintiff, about forty years of age, was injured on August 2, 1924. He had been working at the St. Louis plant about nine days as a riveter. However, prior thereto, for more than seven years, he had operated a reaming machine and did other work for defendant corporation in its plant at Madison, Illinois.

Plaintiff, at the time of the injury, was standing still and working about the middle of the length of the car, on the west side thereof, between the cover plate and the west side of the car. While thus riveting, with his back to Jackson and a few inches from him, without warning or knowledge of any kind that Jackson was near him, the reamer, operated by Jackson, caught on the right side of his body, on his shoulder, and tore his jumper and his underclothes from him, and, while spinning, it became entangled in his jumper sleeve and kept twisting, thus twisting his hand off about four inches above the wrist.

As to a warning, plaintiff testified: "If anybody came near you, near enough to hurt you, they would always tell you to look out. They would always tell you to look out or come and touch you and tell you that they are there to keep you from moving. If he was too close to you he would always notify you. He would say, 'I am getting pretty close to you,' or something like that. Q. On this occasion did Jackson give you any notice whatsoever? A. No, sir."

As plaintiff worked, the cover plate came opposite a point between his waist and chest, about three and a half feet above the foundation on which he stood. Six inches intervened between his body and the place Jackson was reaming. He said while at the Madison plant, reamers and riveters never worked together on the same car, and there was nothing that required plaintiff and Jackson to work on the car at the same time. However, on cross-examination, plaintiff said that "at Madison when the reamer was working in the same car with the riveter, when they got close together, the reamer would tell him to look out."

Plaintiff stated he had difficulty with Jackson the first day, for Jackson failed to guide the reamer properly, but rather pushed and jerked it. Plaintiff told him that, if he was not more careful, he would hurt someone. He agreed to use greater care, but stated that he had to push on the reamer as the track was rough. The day previous to his injury, plaintiff spoke to the foreman, saying that he was afraid Jackson would hurt him, and asked to be permitted to work in another position, because he had heard Jackson had caught another with the reamer and he was afraid of being caught. The foreman agreed to speak to Jackson, but told plaintiff that it was a rush job and that they would have to get along that day. The first day he noticed that Jackson permitted the reamer to move "sort of unevenly and jumpy," and asked Jackson to be more careful, but Jackson said it was caused by the roughness of the track overhead.

Relative to the custom of giving notice or warning before the reamer was moved, plaintiff said it was not the custom and he did not mean that every time the reamer moved from one hole to another, three inches away, they would "holler" at him.

The reamer was controlled by a wheel similar in size to the steering wheel of an automobile, about shoulder high.

Defendant's evidence tends to show through defendant Jackson that, when he last saw plaintiff previous to the injury, plaintiff was sitting on the trucks, and he had handed his hammer to his bucker, preparatory to driving other rivets. Jackson at that time was proceeding north, reaming holes in the cover plate, and plaintiff was four or five feet from him. As Jackson dropped the bit of the reamer into a hole, plaintiff dropped his hand on the cover plate to get up on the car, and the bit caught the fingers of plaintiff's glove, turned

him around and threw him against the truck. Jackson said that, as he came close to plaintiff, within six inches of him, he knew that, if it should strike his clothing or his body, he would get hurt. If he came too close to him, of course he would warn him. The reamer did not make much noise. As Jackson was making the final movement with the reamer, before the injury, he saw plaintiff beside him about two feet away. He knew that plaintiff was going to get up on the reamer plate, because he ordinarily did so, but he did not know that plaintiff was going to put his hand so close to the reamer. Plaintiff did not have to put his hand on the cover plate to raise himself, but that was the easiest way to get up. He stated that, if a man was in his way, he would warn him to get out of his way. If he saw he was too close and was not looking, he would warn him. A signed statement made by Jackson and introduced by plaintiff reads: ''And while guiding the reamer to the next hole, the reamer caught Gettys, whose back was turned toward the reamer. Gettys did not move.''

The testimony of the foreman tends to show that Jackson was a careful and efficient man, and he denied that he had any conversation with plaintiff regarding Jackson, such as plaintiff related in his testimony. Other pertinent facts, if any, will appear in the opinion.

The petition, after averring that plaintiff and defendant Jackson in the employ of defendant corporation were working on a car under construction, and, together with other employees working on said car, were engaged in their respective duties, charges specifications of negligence, in substance, as follows: (1) The corporation negligently required plaintiff and the other employees to work unnecessarily close to each other while performing their duties. (2) The corporation failed to exercise ordinary care to furnish plaintiff and his co-laborers sufficient space for doing their work. (3) The corporation caused and permitted these workmen to be overcrowded while doing their work. (4 and 5) The fourth and fifth specifications of negligence found in respondent's petition aver the track upon which the reamer was moved from one place to another was defective and dangerous, because it was rough and uneven, and that the corporation permitted such a condition to continue after notice thereof. These two specifications of negligence were withdrawn from the consideration of the jury by defendants' instruction to that effect. As plaintiff has not appealed, said specifications are thus eliminated from further consideration. (6) Jackson did negligently and suddenly move, push and propel said reaming machine and crane forcibly and violently towards and against plaintiff. (7) That Jackson failed to give any signal or warning of the movement of the reaming machine. (8) Jackson was an incompetent and unsafe employee, in that he frequently pushed the reaming machine suddenly, with unnecessary force and violence, and without giving any warning of such

intended movement. The joint answer of defendants was, first, a general denial, and, second, a plea that plaintiff negligently placed his hand in a position to be caught by the reamer. The reply was a general denial.

Both at the close of plaintiff's case and at the close of the whole case, each defendant offered and requested the trial court to give an instruction to the jury, in its and his behalf, directing a verdict against plaintiff, which the court refused to give. Thereupon the defendant corporation offered and requested the court to give to the jury certain withdrawal instructions, lettered A, B, C and D, which the court also refused to give, the propriety of which we will consider and discuss in relative order. However, the trial court gave to the jury the withdrawal instruction previously mentioned herein, but other than said withdrawal instruction and one other instruction, which authorized nine or more of the jurors to return a verdict, the cause was submitted to the jury without instructions.

I. The refusal of the court to direct a verdict for defendants and the refusal of the court to give the withdrawal instructions are questioned. The positions taken by defendants are interrelated and interdependent, with the exceptions that the propriety of a directed verdict depends upon the sustention of each and every withdrawal instruction, or the finding that the injury to plaintiff was caused by the negligent act of a fellow-servant.

Because defendants refused to stand on their respective demurrers to the evidence, offered at the close of plaintiff's case, and introduced proof in their behalf, they have waived them, and it results that the demurrers to the evidence, offered at the close of all the evidence, search the whole evidence to determine whether plaintiff made a submissible case. Furthermore, the evidence in plaintiff's favor must be taken as true, and he is entitled to the benefit of all favorable inferences as may reasonably be drawn from the facts adduced.

(a) The petition charges that Jackson was negligent in failing to warn plaintiff of the movement of the reamer. With respect to a practice or custom to warn, St. Louis & S. F. Ry. Co. v. Jeffries, 276 Fed. 73, l. c. 75, has this to say: "We are of the further opinion that it was not incumbent upon plaintiff to show such a custom as would make it a rule of the common law. A servant has the right to rely on signals and warnings customarily given in the conduct of the business in which he is engaged, and if the master fails to give these, he is negligent." Consequently, it is the non-delegable duty of the master, where the situation requires a warning, or where it is the practice and custom to give one, to warn the servant of any danger that is liable to make the place, in which the

servant is working, perilous. [Koerner v. St. Louis Car Co., 209 Mo. 141, 107 S. W. 481; Bender v. Kroger Grocery Co., 310 Mo. 488, 276 S. W. 405; Johnson v. Brick & Coal Co., 276 Mo. 42, 205 S. W. 615; Enloe v. Car & Foundry Co., 240 Mo. 443, 144 S. W. 852; Landcaster v. National E. & S. Co., 1 S. W. (2d) 238.] The evidence discloses that it was the practice and custom of Jackson, in operating the reamer, on moving it close to or near plaintiff, operating the pneumatic hammer, to warn him of its proximity. That Jackson did not so warn plaintiff is conceded. However, defendants insist that the record lacks probative evidence of the existence of a rule or custom to so warn, or a situation rendering a warning imperative. In performing their work, Jackson and plaintiff, as each moved toward the center of the length of the car under construction, would necessarily pass each other. The space in which plaintiff worked was two and a half feet in width. He was thus in danger of injury from the reamer unless warned of its approach, for plaintiff had his back to Jackson's movements and could not hear his approach, because the reamer was practically noiseless, while the din from the pneumatic hammer was deafening. Plaintiff's proof developed a practice or custom on the part of the reamer to warn the riveter on approaching near or close to him. Jackson said that, if he came too close, he would warn him. Moreover, Jackson said that, when plaintiff was two feet away, he knew that plaintiff was going to get up on the cover plate, because he ordinarily did so. Here we find a custom or practice, and therefore a duty, on the part of the master to warn an employee working in the scope of his employment, who, at that time, was not conscious of the close approach of an agency, operated by the master, which was potentially dangerous. The fact that the duty of warning was delegated by the master to Jackson did not relieve the master. As there was evidence of defendant's negligence to support the averment of the petition as to a failure to warn, the trial court properly overruled the instructions requesting a directed verdict in favor of defendants. This ruling also disposes of defendant's withdrawal Instruction B, declaring that there is no evidence that defendant corporation by rule, custom or course of conduct and operation required the giving of signals when the reamer was about to be moved.

(b) The giving of withdrawal instructions, even though the record lacks sufficient proof to submit the particular specification of negligence sought to be withdrawn, depends upon their relativity to the facts in evidence. It is a cardinal rule that a withdrawal instruction may not be given, if it affects the facts of the specification upon which liability may be justly predicated. Such instruction should be clear and unambiguous, without leaving the matters to be withdrawn in doubt, and without, in any manner, confusing or misleading the jury. Moreover, it should

798

not intermingle the matters sought to be withdrawn with other matters properly in the case, nor should it be too broad or too indefinite. [Schulz v. Smercina, 1 S. W. (2d) 113; Clift v. Railroad, 9 S. W. (2d) 972.]

(c) Withdrawal Instruction A declared, in substance, that there is no evidence tending to show that defendant Jackson pushed or propelled the reaming machine against plaintiff, and directed the jury to disregard the averment. The evidence develops that Jackson was operating the reamer. Plaintiff was working between the west center sill and the west side of the box car, near and close to the place where Jackson was reaming. The evidence for defendant establishes that the reamer moved on the overhead track smoothly and that the apparatus was in good working order. The reamer had two controls, one, an electric button, controlling the movement of the reamer longitudinally, and the other, manual, controlling the gyrating or transverse movement of the reamer. A witness said: "The transverse motion of the reamer is controlled by pushing or pulling it." The whirling bit of the reamer caught the clothing of plaintiff on the right shoulder or side. As plaintiff was stationary, and as the reamer came in contact with him, it may be inferred that Jackson propelled or pushed the reamer to such contact. The act probably was inadvertent, but the question of its being negligently done was for the jury. In any event, to have given the instruction would have tended to confuse and mislead the jury. They might have believed that they were not authorized to consider such facts and circumstances in determining defendant's negligence.

(d) Withdrawal Instruction C declared that there is no evidence that plaintiff and other employees were required to work dangerously close to each other while performing their duties, or that they were in danger thereby and not reasonably safe, or that said corporation failed to exercise ordinary care to furnish plaintiff with a reasonably safe or sufficient place or space for doing his work, or negligently caused or permitted plaintiff and other employees to be overcrowded in doing their work, and directed the jury to disregard the averments.

We also think that this instruction might have tended to confuse and mislead the jury. Because of the necessity of Jackson and plaintiff coming into close contact and eventually passing each other as they progressed in their work, the giving of the instruction would have permitted the jury to conclude that the space allotted for the work, as they came close to each other, rendered the working situation reasonably safe and not dangerous, thus deleting from their minds the consideration of a warning by Jackson as a predicate to liability. There was no danger from lack of space while Jackson and

plaintiff were at opposite ends of the car, but, as they came near each other in the performance of their respective duties, danger appeared unless Jackson warned plaintiff. The jury might have concluded the instruction meant that they could not consider the matters for any purpose.

(e) Withdrawal Instruction D declared that there was no evidence tending to show that defendant corporation delegated to defendant Jackson the duty of giving signals and warning before moving the reamer in the course of his work, and directed the jury to disregard the averment.

If it was the practice and custom, when coming close or near to each other in the course of their work, for the reamer to notify or warn the riveter of that fact, then such practice and custom was tantamount to a duty that devolved upon the master, even though evolved from the course of the work. That duty the corporation left to Jackson to perform, which it thus delegated to him. For his failure in that regard, the corporation was responsible. To have given the withdrawal instruction would have constituted error.

II. It is said that plaintiff cannot recover against defendant corporation because the acts of Jackson, in the operation of the reamer, were the acts of a fellow-servant. It is argued that, where the injury results from the negligence of a fellow-servant in failing to conduct himself carefully in some ordinary operative detail of the work being done, then the proximate cause is not a violation of the safe-place rule, but is the negligence of a fellow-servant.

The evidence develops that plaintiff was in his place of work. While the master was not an insurer, it was the duty of defendant corporation to exercise ordinary care to see that the place of work was kept reasonably safe. The practice and custom of warning of his presence, when the reamer, in the course of his work, came near or close to the riveter, had evolved from the work and was in effect equivalent to a rule. The duty to warn thus devolved on the corporation. This nondelegable duty was by force of circumstances and custom entrusted to the reamer. The theory of the corporation's liability was not the manual act of Jackson in handling and operating the reamer, but it was the failure of Jackson, the *alter ego* of defendant and acting for it, to warn plaintiff of the proximity of the reamer so that he might protect himself. The failure to warn was not, on principle or precedent, the act of a fellow-servant. The principles found in the following cases are analogous and support our conclusions: Koerner v. St. Louis Car Co., 209 Mo. 141, 107 S. W. 481; Bender v. Kroger Grocery Co., 310 Mo. 488, 276 S. W. 405; Johnson v. Brick & Coal Co., 276 Mo. 42, 205 S. W. 615.

III. The third assignment of error reads: "The court erred in permitting respondent's counsel to make prejudicial and inflammatory remarks and to ask an improper question; and in refusing to discharge the jury on account of such remarks and question." The matters complained of we will consider in detail as briefed.

(a) The question asked by plaintiff on the cross-examination of defendants' witness, reads: "Just before this accident occurred, a man had been hurt in connection with a reamer on one of those cars, hadn't he?" Defendants objected because it was improper and prejudicial and as having no bearing on the issues; because this man never hurt anybody, but, if he did, it was immaterial to any issue. Defendants then asked the discharge of the jury. The court sustained the objection, but refused to discharge the jury.

Whether the effect of the mere asking of a question is prejudicial is a matter largely within the province of the trial court, and, unless a clear abuse of discretion appears, we refuse to interfere. In this instance the defendants had the benefit of the defendants' positive statement, "This man never hurt anybody." Moreover, the court sustained the objection. With the live situation of the occurrence and trial before it, the trial court could better judge of the effect of the question upon the jury than we can. The matter of discharging the jury must be left largely to its discretion; but, impressed with such discretion, trial courts should not hesitate to declare matters prejudicial, where the occurrence, in its opinion, warrants such action. The case of State v. Burns, 286 Mo. 665, 228 S. W. 766, is not analogous as to the facts.

(b) Plaintiff testified, in substance, that he told the foreman that he had heard that Jackson had caught another with the reamer and he was afraid Jackson would catch him. He also testified that Jackson, when asked by him to be more careful in operating the reamer, replied that he would, but that he had to push on it because the track was rough. By the withdrawal instruction given, the jury were told to disregard all averments touching the rough and uneven condition of the track on which the reamer ran. In his argument to the jury, plaintiff's attorney said:

"Plaintiff thought Jackson had run into somebody else with this electric reamer, and the plaintiff, Gettys, had complained to his boss about it, and Jackson, when asked about his conduct, said it was because and on account of trouble with the track being rough and uneven."

Immediately, defendants' attorney objected because the subject had been withdrawn from the jury. Plaintiff's attorney argued that, though the assignment was withdrawn by the instruction, the evidence was not withdrawn. The court overruled defendants' objection,

but admonished plaintiff's attorney to refrain from further comment on the subject. Plaintiff's attorney proceeded as follows:

"It is not ground for recovery on the proposition of whether the track was rough and uneven, but you can still take into consideration whether Jackson is telling the truth when he testified he didn't tell anyone anything about that being the reason for his trouble with this reamer, or whether plaintiff is telling the truth when he told you men that Jackson said that was the reason, because the track was rough and uneven. . . ."

Defendants objected because the argument contravened the warning of the court and requested that the jury be discharged, but the trial court overruled both the objection and the motion.

Several other remarks were made by plaintiff's attorney, to which the court sustained objections. Subsequently the following occurred in said attorney's argument:

"Gentlemen, it may be true, as Mr. Gentry said, that he would hate to see the day come when race, color or creed would make a difference, but we know that it does make a difference, and further, I want to tell you, gentlemen, if this was a white man they wouldn't be here; they would have settled with him; they would be too scared to come in here with a white man as plaintiff in such a case as this and deny that they were negligent."

The court sustained an objection made by defendants. On the ground that the remarks were prejudicial and improper, defendants asked that the jury be discharged. The court overruled the motion to discharge the jury, but told them to disregard that statement.

Defendants charge error relative to the remarks of plaintiff's attorney herein set forth, because they were highly prejudicial, inflamed the jurors' minds, and aroused ill-feeling against defendants, for the reason that they were unsupported by any evidence.

Was the argument, or any portion of it, prejudicial? That is the crux of the matter. It is true that the assignment of negligence with respect to the track being rough and uneven had been withdrawn from the jury. It is also true that plaintiff's attorney disclaimed any right of recovery on the ground that the track was rough and uneven. The jury, however, had heard the evidence which came in without objection from defendants. With this evidence before the jury, we are unable to say that it was prejudicial, and we think that these particular facts constitute it, as to the prejudicial effect, a matter for the determination of the trial court on motion for a new trial.

Whether the argument as to race, color or creed is prejudicial, is a more serious question. The context tends to show that it was retaliatory. Fragments of the argument only are preserved. That plaintiff was a negro seems to be unquestioned. We see nothing prejudicial

in quoting what defendants' attorney said, and if that was not true, defendants could have shown it by setting forth their argument in the bill of exceptions. To argue that, "but we know that it (race, color or creed) does make a difference," is merely arguing deductions from experience in life, which we infer was common knowledge to the jurors. We are unable to deduce that the statement inflamed or prejudiced the jury. This was also a question to be determined by the trial court.

Defendants particularly attack the argument that, if he had been a white man, they would have settled with him and they would be too scared to come in here with a white man as plaintiff in such a case as this and deny that they were negligent. While the language was crude, an analyzation of the argument convinces us that it was an emphatic statement that the facts developed defendants' negligence, with a plea to the jury to extend the same consideration to a negro that it would give to a white man. The plaintiff was entitled to this. Moreover, we cannot say from the context that defendants did not invite it. An able *nisi prius* judge considered the matter and refused to hold it prejudicial. In this regard, in Wendler v. People's House Furnishing Co., 165 Mo. 527, l. c. 542, 65 S. W. 741, the court say: "The trial judge having heard all the arguments is in a much better position to know whether an improper influence has been exerted than the appellate court can possibly be with only a fragment of the speech quoted." [Irons v. American Ry. Express Co., 300 S. W. 283.] We are unable to perceive that the argument was prejudicial.

It follows that the judgment must be affirmed. It is so ordered. *Henwood, C.,* concurs; *Cooley, C.,* not sitting.

PER CURIAM:—The foregoing opinion by DAVIS, C., is adopted as the opinion of the court. All of the judges concur.