FRANK FISHANG v. EYERMANN CONTRACTING COMPANY, Appellant.—
63 S. W. (2d) 30.

Division Two, September 4, 1933.

*Wayne Ely* and *Tom Ely, Jr.*, for appellant.

*Henry Ebenhoh* and *George W. Johnson* for respondent.

COOLEY, C.—This is an action for damages for personal injuries and damage to his truck sustained by plaintiff, respondent, when he backed his truck over the edge of and into defendant's quarry. The accident occurred November 14, 1927. The cause was tried June 16, 1930, thirty-one months thereafter, resulting in the following verdict:

"We, the jury in the above cause find in favor of the plaintiff on the issues herein joined and assess plaintiff's damages at the sum of eight thousand three hundred ninety-five 60/100 dollars.

"CARL C. HUDSPETH, Foreman.

"As follows:

"Damage to truck ..........................$ 208.60
"Medical attention ........................... 87.00
"Disability, thirty-one months at $100.00 a month . 3100.00
"For physical injury .........................5000.00

$8395.60"

Judgment was entered on the verdict for the aggregate sum of $8395.60. If plaintiff is entitled to recover defendant does not challenge the first two items of the verdict. It contends that he was not entitled to recover at all, largely on the ground that the evidence conclusively shows that he was guilty of negligence which caused or contributed to his injury, and that in any event the evidence did not authorize recovery of the $3100 item.

Defendant, a corporation, had charge and control of an abandoned quarry in St. Louis into which it allowed persons so desiring to dump cinders, dirt, ashes and rubbish for a stipulated sum per load. It kept an employee, one Gastreich, sometimes referred to in the evidence as caretaker, or dumpkeeper, in charge of the quarry. The cavity was variously estimated at from seventy-five to one hundred and fifty feet deep. From the edge to the bottom thereof the descent, though not vertical, was precipitous. Plaintiff had dumped ashes and rubbish at the quarry several times a week for some time prior to the time of his injury and was familiar with the general situation, though previously he had always dumped on the north side opposite the place on the south side at which he was directed by Gastreich to dump on this occasion. He had never before dumped on the south side. He testified that Gastreich had always directed him where to dump and did so on the occasion in question; that on this occasion Gastreich "indicated for me to come forward and turn my engine toward his house," thus turning the rear end of the truck toward the quarry, and then motioned to plaintiff to "come back," which he did, slowly; that when he was within seven or eight feet of the edge of the quarry, as nearly as he could tell by looking through his mirror, he stopped, put his gear lever in neutral, leaving the engine running, put on his brake and started to get out of the cab of his truck, intending, as had theretofore been his custom, to walk back and survey the ground and ascertain the precise distance of his truck from the edge of the quarry; that thereupon and before he could get out so as to see behind the truck Gastreich "interrupted me with the remark, 'what are you getting out for? God damn it, you got a mind. Watch me, I will tell you when to stop;' " that he thereupon, in obedience to and reliance upon Gastreich, put his truck in reverse and, keeping his eyes on Gastreich, came back slowly and carefully as Gastreich motioned; "I drove back at a creeping speed, as slow as the truck would go;" that as he thus came back Gastreich said:

"Come on back; come on; plenty of room;" that when he felt the rear end of his truck sink he threw out his clutch and put on his brakes but was unable to stop and, with the truck, went to the bottom of the quarry; that just about as he felt the rear wheels of his truck going over the edge Gastreich, in an excited voice, said "something in the nature of 'whoa;' that was about the time I put the brakes on." The testimony of one of plaintiff's witnesses, George Kalinowski, who observed the accident, tended to corroborate plaintiff's testimony that Gastreich was directing him. Kalinowski was not observing and did not see and hear what occurred before plaintiff started to back slowly under Gastreich's direction but he heard Gastreich bid plaintiff "come on back" when plaintiff was five or six feet from the edge "crawling along, moving back slow," and heard Gastreich say "whoa" when plaintiff was "practically at the edge of the quarry" but it was "just too late and down into the opening he went." Kalinowski's testimony indicates that Gastreich, sometimes at least if not generally, thus directed other persons as they backed to the edge of the quarry. He said: "When you are backing in the quarry the gentleman (dumpkeeper) will say 'come on back' until you are finally at the opening where he wants to set you." But he himself always dumped without Gastreich's assistance.

One of defendant's witnesses, Connors, who saw plaintiff when he was seven or eight feet from the edge of the quarry, backing toward it, but did not see or hear what immediately preceded, testified that he then heard Gastreich say to plaintiff, "Come on back about four feet," and then "I turned my head for a minute and then I heard Gastreich say, 'whoa.' Sometimes when he ends up he will say 'whoa, that will be far enough.'" On this point Gastreich, for defendant, testified that plaintiff stopped his truck seven or eight feet from the "dump," killed his motor, got out and "walked around to the edge of his truck and looked around," then got in the truck and as he sat down behind the wheel witness said to him, "come easy about four feet," which was all that he said to him; that plaintiff then stepped on his starter; witness thought the car must have been in gear "as it took hold when he stepped on the starter. The car jumped back immediately and went over the bank."

Plaintiff's evidence tended to show that there was no bumping log or barrier of any kind at the edge of the quarry to prevent trucks backing too far when backing up to dump; that the ground at and about the edge was level. From some of defendant's witnesses there was testimony tending to show that it was customary at this and other similar quarries and dumping places to maintain a bumping log or a barrier of dirt at the edge to prevent accidents such as the one in question. Defendant claimed and introduced evidence tending to show that it always maintained such barrier at

the quarry in question and that there was one composed of earth at the place where plaintiff was directed and where he attempted to dump on this occasion. Different witnesses estimated its height at from one to one and a half or two feet. Richard Ramstein, for defendant, testified that he had been in the grading business and had used the Eyermann dump as well as other dumps; that in the Fall of 1927 "the times that I was there, there were either old timbers or piles of dirt around the edge of the quarry where the truck would dump over;" that he would call a piece of timber a bumping log; he had seen one at the Eyermann quarry; "they always had timbers or mounds of dirt at that quarry between the years 1925 and 1928, prior to November 14, 1927," but he didn't know whether they had one there that day or not. Gastreich, relative to the alleged barrier testified "a bumping log is whatever you make it of,—twelve by twelve, four by four. I have seen lots of them at different dumps." He first said, "there was one there on November 14, 1927, right at the edge of the dump where Fishang backed to the dump," but upon being confronted with a different statement he had made in a deposition said there was not a timber but a dirt barrier, two feet high; there had been a bumping log there "when the city had the dump;" "the reason I haven't the bumping log there is because I am crippled, and it sinks down in the hole about four feet every night and I can't handle it. I use the pile of dirt instead." The facts bearing upon the dispute as to the $3,100 item and such further facts as it may be necessary to state relative to other questions will be given in connection with the points to which they relate.

I. Taking up first the question of liability generally, we do not understand appellant seriously to contend that there was not a submissible issue made as to its negligence, particularly if Gastreich was acting within the scope of his duties as its employee in directing plaintiff's movements as he backed toward the edge of the quarry. But appellant asserts, (a) that there was no evidence tending to show that Gastreich was acting within the scope of his employment in so doing and (b) if he was so acting plaintiff was nevertheless guilty of contributory negligence in obeying and relying upon his direction.

(a) The quarry and its appurtenant premises were in possession and control of the defendant company and it was used as a dumping place. Persons having refuse to dispose of were invited to use it for that purpose, which they did, paying for the privilege. Such persons, of whom plaintiff was one, were invitees of defendant upon the premises, to whom it owed the duty of exercising ordinary care to protect them from injury. That much is conceded. Gastreich was defendant's employee, the only one it had, so far as the evidence shows, at that dump. He was apparently in complete

charge there. Everything done there on defendant's behalf, so far as shown, was done by him or at his direction and under his supervision. He testified he had been employed there about five years. Mr. Eyermann, president of defendant company, testified that "Mr. Gastreich was in charge of the dump" in July, 1926, when he said certain warning signs, about the presence of which the evidence was conflicting, had been put up. If Gastreich was in charge of the dump then he presumably was at the time of the accident for there was no attempt to show any change in that respect between July, 1926, and November 14, 1927. The evidence on both sides shows that he directed all persons using the quarry where to dump each load. It is inferable from the testimony of Kalinowski and Connors, set out in our statement, that on occasions he had directed other truck drivers in backing up to the edge of the quarry just as plaintiff testified he directed him on this occasion. By his own testimony it was he who looked after keeping up the barrier which he said was maintained at the edge of the quarry. In short, as we have stated, everything that defendant did at and about the quarry and in conducting its business there it did through its employee Gastreich. It made no attempt to show that his authority to act for it there was restricted or was narrower in scope than it appeared to be from his acts and conduct, viz., plenary, or that it did not know and acquiesce in all he did. The instructions required the jury to find that Gastreich in negligently directing plaintiff to back his truck too near the edge of the quarry, etc., if he did so, was acting within the scope of his employment. His authority as given by defendant or as exercised by him with defendant's knowledge and consent, was provable like any other fact, by the facts and circumstances in evidence. There was ample evidence from which the jury might find, as it did, that he was acting within the scope of his employment so as to make defendant responsible for his act in question.

 (b) Appellant stresses the fact that, to plaintiff's knowledge, danger inhered in the act of backing up to the edge of the quarry and cites cases holding in substance that where one voluntarily and unnecessarily places himself in a dangerous situation, realizing the danger thereof and the hazard to which he exposes himself and is injured thereby he cannot recover damages for such injury notwithstanding the dangerous situation was brought about by the negligent act of another. And appellant argues further that even though Gastreich directed him as he testified, he himself was negligent in obeying and relying upon Gastreich's direction. We have examined the cases cited and others and find none that in our judgment justifies such holding on the facts of the instant case or that is sufficiently similar in its facts to require specific notice. As said in Slagel v. Chas. A. Nold Lumber Co., 138 Mo. App. 432, 435, 122 S. W. 321, in cases of this nature differences in the facts which might appear

small may make a great difference in the legal result. Let it be assumed that, though plaintiff had never before dumped at the particular spot in question, he knew or should have seen that there was no bumping log or barrier there and realized the danger inherent in that situation. He was proceeding prudently to guard against that danger by stopping and getting out of his truck to make a careful look so as better to acquaint himself with the exact distance and the physical conditions when Gastreich, defendant's representative in apparent authority, interfered, bade him stay in the truck and move back under his guidance, promising to tell him when to stop. He had not solicited Gastreich's assistance. He intended to rely upon himself. If he had been permitted to do that and had misjudged the distance or his speed in backing, or for some such cause had backed over the edge and were now seeking to recover on account of defendant's negligence in failing to provide a bumping log or barrier we would have a different question with which to deal. But such is not this case. We cannot overlook Gastreich's direction to him and the fact that Gastreich was in charge of the premises and in apparent authority there as the owner's representative. And, assuming that plaintiff moved back as slowly and carefully as he testified he did, if Gastreich had guided him carefully and told him when to stop as he promised and as plaintiff reasonably expected, he would not have been hurt. Under the circumstances we see nothing unnatural or unreasonable in plaintiff's obedience to and reliance upon Gastreich's direction.

"... The question of contributory negligence is for the jury unless the evidence conclusively shows it. It is not conclusively shown when from the facts proved reasonable men may draw different conclusions." [Albrecht v. Schultz Belting Co., 299 Mo. 12, 22, 23, 252 S. W. 400, 403.] And see Cech v. Mallinckrodt Chemical Co., 323 Mo. 601, 20 S. W. (2d) 509, and cases.

It cannot be said in this case that the evidence conclusively shows plaintiff to have been guilty of negligence causing or contributing to his injury. That question was submitted to the jury by an instruction given at defendant's request and was decided adversely to defendant.

II. Complaint is made of the rejection of certain testimony offered by defendant. Its witness Ramstein testified: "I have been using dumps for several years." Up to that point in his testimony, that is all he had said concerning other dumps or his knowledge thereof or experience therewith. Defendant's counsel then put this question: "From your experience in dumping at various quarries, and from your knowledge from conditions existing at various quarries where you have dumped, from your knowledge of the conditions existing at the quarry at Pennsylvania and Meader Streets (defend-

ant's quarry) when you dumped there from 1925 to 1928, state whether or not all of the times that you dumped there the edge of that quarry was safeguarded, as well, or in as safe a condition, the edge of it, as any other quarry you ever dumped in." Plaintiff's objection that the question called for a conclusion was sustained, whereupon defendant offered to prove by the witness that the grounds of the Eyermann quarry "were in a reasonably safe condition for use as a dumping ground, and that the edge of the embankment was in as safe a condition as any other quarry he (the witness) ever dumped in;" which offer of proof was rejected. The question not only called for the conclusion of the witness but asked for a comparison with other quarries about the conditions of which no showing had been made. Such other quarries may not have been conducted in the customary manner and may not have been reasonably well safeguarded. The offer of proof was even more objectionable. It contained the same vice and further included the offer to have the witness state that the grounds were in a reasonably safe condition for use as a dumping ground, obviously a conclusion which it was for the jury to draw from all the facts, not for the witness to state. The offered testimony was properly rejected.

 III. Appellant assigns error in that the court refused to give certain withdrawal instructions requested by it. Plaintiff in his petition, after describing the physical situation at the quarry, etc., charged in substance that: defendant, through its servants, etc., negligently directed him to drive his truck to and upon the edge of the excavation; that it so directed him to drive his truck backwards to the edge of said excavation and failed to give him any signal or warning that he was approaching too close; that it negligently failed to provide a bumping log or block at the edge of the excavation; and negligently failed to provide any barrier or other means of protection at the edge of the excavation to prevent the truck from falling therein. Defendant's requested Instruction D reads as follows:

"The court instructs the jury that among the charges of negligence made by plaintiff against defendant is the charge that defendant failed to provide a bumping log or bumping block at or near the edge or embankment of the quarry mentioned in the evidence.

"*And you are instructed that this charge is withdrawn from your consideration and plaintiff is not entitled to recover on that ground.*" By a similarly worded instruction, E, defendant sought to have withdrawn from the consideration of the jury the charge of negligence in failing to provide any barrier at the edge of the excavation.

There was evidence tending to prove both of the alleged facts sought to be withdrawn. Under all the facts and circumstances in evidence it was at least a submissible issue as to whether or not the

failure to provide a bumping log or other barrier was negligence on defendant's part. Moreover, whether or not plaintiff would have been barred of recovery on the ground of contributory negligence had he not been acting under the direction of Gastreich, the existence or nonexistence of a protecting barrier at the edge of the quarry is inextricably interwoven with other facts necessary to be taken into consideration in appraising the conduct of the parties and determining the question of negligence. For example, if there had been a barrier or other protection such as would have tended to prevent a truck from going over the edge the jury might have believed the situation called for less vigilance on the part of Gastreich in directing plaintiff as he moved backward than if no such barrier were there, and *vice versa*. We need not consider whether the withdrawal instructions would have been proper had they merely sought to tell the jury that plaintiff could not recover on the ground of absence of a bumping log or barrier. As intimated above, absent such barrier and absent also the question of Gastreich's direction, plaintiff's alleged contributory negligence would present a different question. These instructions went farther and sought to tell the jury that those charges of negligence were not to be considered, which might well have been understood by the jury to mean that the facts upon which they were based and which plaintiff's evidence tended to prove were not to be considered. Those facts were too much a part of the picture to be blotted out. In Gettys v. American Car and Foundry Company, 322 Mo. 787, 797, 16 S. W. (2d) 85, 88, we thus stated the rule: "The giving of withdrawal instructions, even though the record lacks sufficient proof to submit the particular specification of negligence sought to be withdrawn, depends upon their relativity to the facts in evidence. It is a cardinal rule that a withdrawal instruction may not be given, if it affects the facts of the specification upon which liability may be justly predicated." We think those instructions were properly refused. [See, also, on this point, Henderson v. St. Louis-S. F. Ry. Co., 314 Mo. 414, 284 S. W. 788.]

IV. We take up now the question of the $3,100 item in the verdict. Plaintiff's petition alleged that as a result of his injuries "he has been unable to follow his usual and regular occupation of delivering ice and coal, and has been required to employ helpers in his stead, and has lost the wages or income of his labor, averaging in amount $1,800.00 per year and will continue to lose same in the future." Plaintiff's given instruction on the measure of damages authorized the jury, upon finding the facts as hypothesized, to award plaintiff, among other items of damage, the loss if any, "of the earnings of plaintiff's work of delivering ice and coal," not exceeding $150 per month during the time, if any, he was unable to work because of his injuries.

The evidence on this subject was mostly given by plaintiff's wife and showed in substance the following: Plaintiff had been in the ice and coal business since April, 1927, about seven months prior to his injury. He bought "the business, the route," for $300. Apparently the route together with an old truck worth about $100 constituted his capital investment. He bought ice and coal from dealers and sold and delivered same, "peddled it," to his customers. Though not clearly shown, we gather that he did not keep a stock on hand but bought only as he made sales or from day to day to meet the demand on his route. Witness (wife) kept the books for him and was familiar with his business and earnings. He had no other source of income. He would report to her each day his receipts and disbursements and she entered same in the book. The difference between receipts and disbursements she called profits or earnings, and these she entered in the book. On cross-examination, when the book had been produced in court and she was being examined from it she said she did not put down the amount paid for ice or coal or the amount received for it, though she testified to the prices, but only put down the "profits," that is—the difference between the amount paid out and the amount received. In reckoning profits or earnings she took no account of depreciation on the truck. There was none on the old truck. Plaintiff traded it in at a time not disclosed on a new one. She did not reckon depreciation on the new truck. It appeared there was no other property on which there could have been depreciation. For the seven months preceding plaintiff's injury, his earnings or "profits," though varying in different months, averaged $300 per month. His average monthly net earnings since his injury have been $100 per month. Prior to his injury plaintiff was doing the work himself with the aid of one helper whom he paid $50 per month. There was practically no other expense. The $50 per month paid the helper is to be deducted from the $300 per month profits. Prior to November 14, 1927, during the summer season, the sale of ice greatly exceeded that of coal. From October 15, to November 14, the sale of ice was much less than it had been in the warmer months. The relative amounts of ice and coal sold after November 14, 1927, is not shown. But the witness said plaintiff had "more business, not a whole lot more," at the time of the trial than before November 14, 1927. Since his injury and up to the time of the trial plaintiff had been unable to do any of the work except to solicit orders and had been compelled to employ two men steadily, paying them $100 per month each. "We have as many customers, but we have to pay these two men, and that is how I figure we only make a hundred dollars a month, we pay two hundred dollars to the helpers now, per month, and before we paid fifty dollars per month to a helper. You can't figure the business close." The books, though available, were not introduced in evidence.

Appellant contends here as it did below that the evidence relative to plaintiff's profits or earnings is speculative, and too indefinite to authorize recovery of that item of damage. It objected at the trial to such evidence on that theory and that the loss sought to be shown was not a proper element of damage. In considering this question it is to be kept in mind that the sufficiency of plaintiff's petition to plead this element of damage is not challenged and that under the instruction given to the jury plaintiff was not permitted to and did not recover for future or prospective loss of earnings, but only the loss he had sustained up to the time of the trial. Nor was his re-covery for the loss of business profits as such, arising out of invest-ment in and operation of a business enterprise. It was rather for the loss of his time or his personal earnings representing the value of the time. His capital investment was insignificant and was merely incidental to the performance of his personal services. The personal element largely predominated. In such case profits are really in the nature of personal earnings, and may be shown as an aid to the jury in determining the value of the time lost. [See 8 R. C. L. p. 474, secs. 37, 38; Baxter v. Philadelphia & Reading Ry. Co. (Pa.), 9 A. L. R. 504, and Annotation, p. 510; Gregory v. Slaughter (Ky.), 99 S. W. 247, 8 L. R. A. (N. S.) 1228, and notes.]

In Ganz v. Metropolitan Street Ry. Co. (Mo.), 220 S. W. 490, 495, it is said: "It is well settled that, in suits for personal injuries, the plaintiff may recover damages on account of loss of earnings or profits in his business, provided such earning or profits are ascertainable with reasonable certainty;" citing and reviewing several prior de-cisions. In the same case, 220 S. W. l. c. 496, the court said: "Loss of 'time' and loss of 'earnings' for that time mean the same thing." It was so held in Slaughter v. Metropolitan Street Railway Co., 116 Mo. 269, 275, 23 S. W. 760. It was competent in this case for plain-tiff to show the earnings made by him in his ice and coal business and his loss thereof caused by his injury.

But it is urged that the evidence is too indefinite and specu-lative to afford a reasonable basis of recovery for the claimed loss of earnings. We are not so persuaded. That plaintiff's books were not kept with precision and did not show the details of his business or the items from which net earnings were computed did not deprive him of the right to recover for loss of such earnings if such loss could be shown with reasonable certainty, notwithstanding the vagueness of the books. Plaintiff's evidence shows with a fair degree of definite-ness that his average net earnings for the seven months during which he had conducted his ice and coal business prior to his injury were $300 per month, less the $50 per month paid to a helper. The evi-dence tends to show that thereafter and to the time of the trial his volume of business and earnings were approximately the same but, owing to his inability to do the work, his average net earnings were

only $100 per month, the difference being accounted for by the fact that he had to pay $150 more per month for help. That evidence indicates a loss of $150 per month due to his injury. The jury awarded him $100 per month from the time of his injury to the trial. In our opinion that award is supported by competent and sufficient evidence. Without further lengthening this opinion by reviewing authorities we refer to the following cases in which we think our conclusion herein finds support: Ganz v. Metropolitan Street Ry. Co., supra; Devoy v. St. Louis Transit Co., 192 Mo. 197, 91 S. W. 140; Gildersleeve v. Overstolz, 90 Mo. App. 518; Griveaud v. St. Louis, etc., Ry. Co., 33 Mo. App. 458; Sinclair v. Columbia Telephone Co. (Mo. App.), 195 S. W. 588; Mabrey v. Cape Girardeau & Jackson Gravel Road Co., 92 Mo. App. 596; Paul v. Omaha and St. Louis Ry. Co., 82 Mo. App. 500.

V. Appellant contends that the award of $5,000 for plaintiff's physical injury is excessive. Plaintiff was thirty-three years old at the time he was injured. He had only a "grammar school education." Prior to his injury he had been in good health. His evidence tended to show a severe injury. He was bruised and cut about the head, receiving a cut three inches long; both ears were torn, one quite badly; and he was injured in the lower part of his back and his hips. He testified that he does not sleep well, is easily excited, gets dizzy if he "rides backwards," does not seem able to "sit in one place without squirming around;" "I always have headaches, which was not true before the accident;" he had sharp, piercing pains in his back and hips after the accident and still suffers pain in his back and hips; his right hip joint was still stiff at the time of the trial. The evidence shows he was still unable to do manual labor such as required in carrying on his business. The medical testimony tended to show that he had received a severe and very painful strain in his back. One doctor said: "I would call the condition in his back a strain or spasm of the muscles, . . . I figured that he must have strained the lumbar vertebrae;" and that plaintiff was excitable and did not rest well. The medical testimony further tended to show that he still has limitation of motion in the hip joints, walks with a limp, cannot bend his body freely, still has the muscular spasms in the muscles of his back and gives evidence of pain in the right hip joint. Dr. Max who examined plaintiff twice, on Wednesday and Sunday next before the trial, testified plaintiff had suffered a loss of sensation in the right hip; that in witness's opinion there were adhesions in the hip joint and a sacroiliac strain; that the hip joint was stiff and the muscles of the back and thigh were spastic; that the same conditions were present at each examination, and in witness's opinion are permanent. He further testified: "He had a nervous tremor. He always had pain; when he tried

to bend over he shook." Dr. Ploch, who examined plaintiff in March, 1930, and again ten days before the trial, also testified to the limitation of motion in the hip joints and the muscular spasms, which he attributed to tendon injuries and that plaintiff's injuries "will be practically permanent." Plaintiff at the time of the trial was still taking treatments for his injuries and still wore a supporting belt or brace about his body most of the time.

In view of the nature and probable permanency of plaintiff's injuries and his diminished earning capacity in the future necessarily resulting therefrom and the pain he has suffered we cannot say that the award of $5,000 is excessive.

The case appears to have been fairly tried and the verdict is supported by substantial evidence. We find no reversible error in the record. The judgment of the circuit court is accordingly affirmed. *Westhues* and *Fitzsimmons, CC.,* concur.

PER CURIAM:—The foregoing opinion by Cooley, C., is adopted as the opinion of the court. All the judges concur.