CLIFFORD J. SMILEY, Respondent, v. ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, a Corporation, Appellant, No. 40988—222 S. W. (2d) 481.

Division One, July 11, 1949.

*M. G. Roberts, Frank C. Mann, C. Wallace Walter* and *Mann, Mann, Walter & Powell* for appellant.

*Chas. P. Noell* and *Jo B. Gardner* for respondent; *J. H. Haley, Jr.,* of counsel.

CONKLING, J.—Clifford J. Smiley, plaintiff-respondent, a switchman, recovered a judgment of $50,000 for personal injuries against his employer, St. Louis-San Francisco Railway Company, appellant. This appeal presents two main questions, (1) was there shown a violation of the automatic coupler statute (45 U. S. C. A. § 2) which proximately caused plaintiff's injury, and (2) was this verdict excessive?

Plaintiff was one of defendant's switching crew operating in its yards in Springfield, Missouri, about 10:45 A. M., on September 21, 1946. The facts relied on and which the jury could and did reasonably find, stated most favorably to plaintiff, are as follows: Plaintiff, and other members of the George Kirkham switching crew, were moving freight cars between defendant's "old yard" and its "Kansas yard", about 2 miles west. This accident occurred in the old yard, which extended east and west and had 9 parallel switch tracks, all connected by lead tracks at the west and east limits of the yard. The west lead track ran southwest and northeast. Along the south edge of the old yard was track number 1, the west bound main line track. The switch tracks of the old yard numbered 2 to 10, north from track 1. The old yard was on a slight down grade to the west toward the west lead track.

At that time another switch crew, of which John Banks was foreman (hereinafter called the "Banks' crew") was also working on and off of the west lead of the old yard placing freight cars on various tracks, including track 3.

Foreman Kirkham and his crew were ordered by Yardmaster LaVelle to move certain cars from track 6 of the old yard over to the Kansas yard; to return certain cars from the Kansas yard to track 2 of the old yard; and then to shove the cars on track 3 of the old yard over to the Kansas yard. The yardmaster told them that "track number 3 is loaded", which meant that the cars on it were "ready to be moved out". Shortly before Kirkham's crew reached the old yard with the cars directed by LaVelle to be brought from the Kansas yard, Banks' crew had kicked some cars in on track 3. Seeing Kirkham's crew approaching, and in order not to interfere with Kirkham's operations, Banks had his engine and the cars it was switching moved in onto track 1 east of the west lead. Kirkham's crew pulled the cars they brought from the Kansas yard in on track 2. Most of those cars were then cut loose from Kirkham's engine and left on track 2.

Plaintiff was on top of those cars. After setting the brakes on the three west cars left standing on track 2, plaintiff got down near the west lead, between tracks 2 and 3, and walked east to prepare the cars on track 3 to be shoved to the Kansas yard. Kirkham's engine was then working from the east lead track at the east end of the old yard setting some of the cars it had brought from the Kansas yard onto other tracks.

After Kirkham's crew had pulled in on track 2, Banks' crew pulled back off of track 1 and from the west lead resumed kicking the cars they were switching in onto the various tracks of the old yard. Banks' crew were merely kicking the various cars in their drag in onto the various tracks to classify or sort them. It was not the duty of Banks' crew to couple together the various cars kicked in on those tracks (including track 3) and no effort was made by them to couple those cars. Other employees testified it was plaintiff's duty, as field man, to couple the cars on track 3. George D. Laker, a switchman in Banks' crew testified that the west end of the west car on track 3 was 400 to 500 feet east of the west lead; that when Pennsylvania coal car 863,205 was kicked into track 3 a box car, then coupled to the west end of that Pennsylvania coal car, was kicked in at the same time; that when those two cars were kicked in onto track 3 no effort was made to couple those cars to the cars already standing on track 3; that when the Pennsylvania coal car was kicked in on track 3, ". . . it was kicked in there, kicked against the other car. . . . Q. Do you remember about the impact of this Pennsylvania car against the other car? A. Well, it wasn't hard. Q. It was the usual impact? A. Yes. Q. One that would make a coupling if it would couple? A. Yes, I guess they went together. Q. Sir? A. I say they could have coupled, yes."

Plaintiff testified, "it was my duty (as field man) to see that they (the cars on track 3) were all coupled up, all the brakes were let off, and that they were all together . . . I started in at the end, the west end of these cars (on track 3) and I went along inspecting to see that there were no brakes on them, to see that they were all coupled up; of course I found this particular car (Pennsylvania coal car 863,205) that was not coupled, the coupling was not completed." The knuckles of the couplers were "closed absolutely tight" but the coupling pin on the east end of the Pennsylvania coal car had not dropped. When the knuckles are together and the couplers closed the pin should drop. Under those conditions the pin "will drop if it is not in bad order". If the two couplers were completely closed together "it doesn't have to be any jar or impact for the pin to drop". But defendant's Foreman of Inspectors, a man of 44 years experience, testified, "Q. You do have trouble with pins sticking up and couplers won't make? A. That is true. Q. But when the couplers are pressed together that pin is supposed to drop down? A. That is

right, when they are thoroughly closed". To complete the coupling it was necessary to drop the pin. If it was not dropped that particular coupling would not hold.

When asked as to the condition of that coupler he was seeking to couple, plaintiff testified, "The knuckles were together and closed absolutely tight, there was no slack in them at all. Q. What did that indicate to you as an experienced man? A. That indicated there had been sufficient impact to couple it up had the pin dropped."

He further testified, "Lots of times you can take hold of this (pin lift lever) and jiggle it up and down and the pin will fall in place. . . . I just stood there (at the side of the car) and jiggled it (the pin lift lever) up and lifted it as high as it could go and I would release this lever and that would give it a chance to drop down in place like it should, raising it up and down that way, if the pin was going to fall it would have fell in place."

It was plaintiff's duty to complete the coupling and necessary that he do so. If he had waited for Kirkham's switch engine to shove through track 3 from the east shoving the cars on track 3 ahead of it, "it would have been too late then . . . because you (the Pennsylvania coal car and those west of it) would have started rolling . . . to the west then . . . there would have been nothing to stop them, they wouldn't have any brakes on them at all", and those cars would have rolled uncontrolled down the grade into the west lead.

After the pin did not drop by manipulation of the lift lever from the side of the coal car, after looking to see that nothing was coming, and to complete the coupling plaintiff "went in between the cars to drop it (the pin) with my hand". It appears that the method was to "go in from the bottom of the drawbar and try to work it down with your fingers."

Not knowing where plaintiff was and not knowing he was between the cars Banks' crew kicked in more cars off of the west lead onto track 3. Those cars struck the west end of the string of cars upon which plaintiff was working and moved the Pennsylvania coal car about half a car length east. Plaintiff testified that while he was in between the coal car and the Central New Jersey box car next east attempting to complete the coupling, the cars "moved all of a sudden". He was knocked down and two wheels of the coal car ran over his left leg. Plaintiff further testified that the cars kicked onto track 3 by Banks' crew, which pushed the Pennsylvania coal car into and over him, were the first cars kicked in onto track 3 after his crew had come back with the cars they placed on track 2. Subsequent ▮▮▮▮ inspection of the coupler on the east end of the Pennsylvania coal car showed no mechanical defect.

▮▮ The statute alleged to have been violated provides, "It shall be unlawful for any common carrier engaged in interstate commerce

by railroad to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars". The test of compliance with that statute is a coupler which may be *used* without the necessity of men going between the ends of the cars. The test is also the operating efficiency of the couplers on cars. Johnson v. Southern Pac. Co., 196 U. S. 1, 18, 25 S. Ct. 158, 162, 49 L. Ed. 363, 370, Chicago, St. P., M. & O. Ry. Co. v. Muldowney, 130 Fed. (2d) 971, 975, Southern Ry. Co. v. Stewart, 119 Fed. (2d) 85, 87; Crabtree v. Kurn, 351 Mo. 628, 173 S. W. (2d) 851. The duty placed on the railroad by the statute is absolute to *use* only those cars upon which are couplers which may be *used* without men going between cars. Chicago B. & Q. Ry. Co. v. United States, 220 U. S. 559, 31 Sup. Ct. 612, 55 L. Ed. 582, San Antonio & A. P. Ry. Co. v. Wagner, 241 U. S. 476, 60 L. Ed. 1110. "If the railroad does, in point of fact, use cars which do not comply with the standard, it violates the plain prohibitions of the law, and there arises from that violation the liability to make compensation to one injured by it". In Coray v. Southern Pacific Company, 69 S. Ct. 273, 93 L. Ed. 243, it is said that the Federal Safety Appliance Act ". . . fairly interpreted, must be held to protect all who need protection from dangerous results due to maintenance or operation of congressionally prohibited defective appliances . . . Liability of a railroad under the Federal Safety Appliance Act . . . follows from the unlawful *use* of prohibited defective equipment", etc. (Emphasis ours)

▮ Defendant here contends that where there was no discoverable mechanical defect in a coupler or pin a violation of the statute can be established only by evidence that, "in a movement *of the car* made for the purpose and with the intent to couple it automatically by impact with another car", it failed to automatically couple. But the above quoted contention does not appear in the statute. And it is not the judicial function to read those conditions into the statute. It is defendant's further contention that if a violation of the statute was here shown, it was "merely one of the conditions which brought about the situation resulting in the injury" and was not the proximate cause of the injury. Those contentions we will discuss in order.

Defendant relies on St. L.-S. F. R. Co. v. Conarty, 238 U. S. 243, 59 L. Ed. 1290, Lang v. N. Y. C. R. Co., 255 U. S. 455, 65 L. Ed. 729, Illinois State Trust Co. v. Missouri Pac. R. Co., 319 Mo. 608, 5 S. W. (2d) 368, Rittenhouse v. St. L.-S. F. R. Co., 299 Mo. 199, 252 S. W. 945, Martin v. St. L.-S. F. R. Co., 323 Mo. 450, 19 S. W. (2d) 470, Chicago, M. St. P. & T. R. Co. v. Linehan, 66 Fed. (2d) 373, and Southern Railway Co. v. Stewart, 119 Fed. (2d) 85. But upon analysis of those cases as applied to the instant facts, we find no support for defendant's contention.

In the Conarty and Lang cases, supra, the cars upon which the injured employee was riding in the yards accidentally collided with cars that had no couplers at all. No effort was being made to effect a coupling of those cars. Inasmuch as the Act "was intended to provide against the risk of coupling cars" and in those cases there was no attempt made to couple to the deficient car or "to handle it in any way", it was held that the Act was not to be extended to situations where there were no couplers at all.

In the Illinois State Trust Company, the Rittenhouse and Martin cases, supra, the couplers involved had become damaged and out of repair. In each of those cases the employee had gone between the cars, not to effect a coupling, but to repair a coupler concededly needing repairs. While it may be agreed that in these three cases there was a violation of the Act in that the coupler ▅▅▅ became defective and out of repair, none of the employees in those three cases was engaged in a coupling effort. There was no desire to couple. The objective was to repair, and there was no other purpose in going between the cars. The Act provides against "the risk of coupling cars", not repairing them. In these repair instances, as distinguished from coupling efforts, it has been held that the "broken coupling merely furnished the occasion for plaintiff's being between the cars," and the broken coupling was held not to be the proximate cause of the injury.

In the Linehan case, supra, there is nothing to support defendant's contention. The plaintiff there was engaged in an effort to couple two cars; the cars failed to couple; he went between them to effect the coupling and was injured when his switch engine moved the cars against him. His judgment was affirmed. It was held that "the failure of a coupler to work at any time sustains a charge that the act has been violated". See also, San Antonio & A. P. R. Co. v. Wagner, 241 U. S. 476, 60 L. Ed. 1110, 1117. The Linehan case expressly rejected defendant's instant contention that where subsequent inspection of the coupler, made soon after the accident, revealed "no mechanical defect" that there "is no evidence which establishes a violation", of the Act. See 66 Fed. (2d) l. c. 380.

In the Stewart case, supra, plaintiff's decedent, as a switchman, had been engaged in coupling cars. Working on the engineer's side of the train, several couplings had been made by impact upon Stewart's signal. Before signaling for the next coupling, and without attempting to open the next coupler with the lift lever from the side of the car, Stewart went between the cars, and for an unknown reason the next car (beyond the opening where plaintiff went between cars) moved against him, resulting in his death. The court merely held that there was no evidence at all that Stewart attempted to use the lift lever to open the coupler, that he went between the cars because the coupler would not open by use of such lever, that the couplers

would not couple on impact, and therefore that the verdict was based on conjecture. That holding sufficiently distinguishes that case and it is not authority here for the contention defendant makes as to the instant facts.

There is nothing in the Act and we find no opinion of any ·court requiring ''a movement *of the car* (here Pennsylvania coal car 863,205) made for the *purpose* ·and with the *intent* to couple it automatically by impact'' as defendant in its brief contends was necessary. No court could read that requirement into the Act. Plaintiff was engaged in an effort to couple these cars. When he came to the east end of the Pennsylvania coal car the pin was up but the knuckles were tightly closed. Jiggling the pin lift lever did not drop the coupling pin. By the operating inefficiency of the pin being up and failing to drop to complete the coupling, defendant failed to comply with the statute. Plaintiff was himself engaged in a coupling operation. His every movement was in an attempt to effect the coupling. In order to perform his duty and make the coupling plaintiff was compelled to do the thing the statute was enacted to avoid, go between the cars.

Under the instant facts while the Pennsylvania coal car was not kicked in on track 3 with an effort or *intention* to couple it by impact to the Central New Jersey box car, it was nonetheless kicked onto that track with ''sufficient impact'' to couple it to that box car. It was the ''usual impact . . . that would make a coupling if it would couple.'' That this coupling did not automatically ''make'' upon this impact was not because an opportunity for an automatic coupling was not afforded. Upon this impact the knuckles on the couplers ''closed absolutely tight'', but because of a defect and operating inefficiency the pin did not drop to complete the coupling. That fact was a violation of the statute.

Under the facts of record here there is substantial evidence that the coupler in question was one which did not couple automatically by impact and was therefore defective. By these facts the violation of ▮▮▮ the Automatic Coupler Act is amply established. San Antonio & A. P. R. Co. v. Wagner, supra, Johnson v. Southern Pacific Co., supra, Truesdale v. Wheelock, 335 Mo. 924, 74 S. W. (2d) 585, Crabtree v. Kurn, supra.

▮ But the defendant contends that even if we should hold (as we do above) that under the instant facts the Safety Appliance Act was violated, that such violation was not the proximate cause of plaintiff's injury. Defendant cites the Illinois State Trust Co., Rittenhouse and Martin cases discussed above (but which do not support its contention on this point); contends that the kicking in of the Pennsylvania coal car against the Central New Jersey box car was completed before plaintiff reached that car, and that the failure of the Pennsylvania coal car to couple, therefore, was not the proxi-

mate cause of plaintiff's injury. But we find nothing in this statute, nor are we cited to any Federal case which declares any principle which compels us to conclude that the movement of the Pennsylvania car, upon which it failed to couple on impact, must have been simultaneous with plaintiff's injury. We cannot say that the Act was so intended by the Congress. It does not say so.

We concede that the violation of the statute must be the proximate cause of plaintiff's injury. Such must be the basic predicate of his right to recover. The presence of plaintiff between the cars was an immediate cause of his injury. His presence there was induced and made necessary by the defective coupling. The direct cause of his presence there was the defective coupling. Except for the violation of the statute plaintiff would not have been there and the injury would not have occurred. That the coupling failed to "make" upon impact shortly before plaintiff reached that point is not fatal to proximate cause. The cars were still not coupled when plaintiff did reach that point and, under his duty to couple, he had to go between the cars only because the coupling theretofore had failed to "make". In the discussion of the question of proximate cause under the Safety Appliance Act, in Coray v. Southern Pacific Co., supra, it was said: "The language selected by Congress to fix liability in cases of this kind is simple and direct. Consideration of its meaning by the introduction of dialectical subtleties can serve no useful interpretative purpose. The statute declares that railroads shall be responsible for their employees' deaths (or injury) 'resulting in whole or in part' from defective appliances such as were here maintained. . . . And to make its purpose crystal clear, Congress has also provided that 'no such employee . . . shall be held to have been guilty of contributory negligence in any case' where a violation of the Safety Appliance Act, such as the one here, 'contributed to the . . . death (or injury) of such employee.' . . . Congress has thus for its own reasons imposed extraordinary safety obligations upon railroads and has commanded that if a breach of these obligations contributes in part to an employee's death, the railroad must pay damages." The use of this defective coupler required that plaintiff go between the cars to effect the coupling. We must decline to indulge in the refinement as to causation for which defendant contends to defeat the claims of natural justice. Here the violation of the statute was clearly the proximate cause of plaintiff's injury. See also, Domitz v. The Springfield Bottlers, Inc., 358 Mo. 412, 221 S. W. (2d) 831.

Finally, it is urged upon us that the judgment of $50,000 is grossly excessive. But plaintiff contends we may not consider the question of the amount of the damages awarded. We have carefully considered the cases cited by plaintiff but limited space forbids their analysis here. The power of this court "to require a remittitur as

484

a condition of affirmance" we restated at great length in Cook v. Globe Printing Company of St. Louis, 227 Mo. 471, 127 S. W. 332. For forty years we have consistently adhered to, and time without number have followed, the conclusions there stated. We see no reason whatever to depart from that doctrine and decline to do so. See Counts v. Thompson, No. 40944, 358 Mo. 485, 222 S. W. (2d) 487.

Plaintiff lost his left leg six inches below the groin. There is a bone projection or spur into the soft tissue ·extending toward the right and at the end of the stump of the left femur. The spur makes it increasingly difficult to wear his artificial limb. Doctor Pernoud, testifying for plaintiff, stated that the spur condition could be surgically corrected. Plaintiff was in the hospital for seven weeks. One of his examining physicians testified plaintiff had evidences of traumatic neurosis but no organic nerve trouble. Another of. his medical examiners, a specialist in nervous diseases testified plaintiff had a traumatic nervousness. But Doctor Steegman, another of his medical examiners and also a specialist in diseases of the nervous system, testified plaintiff's condition would improve with the closing of his litigation. He also testified plaintiff had a tenderness over the lumbo-sacral joint and a vegetative neurosis. Plaintiff testified he had pain in the back and chest, headaches, dizziness, nervousness, excessive perspiration, and had never had to wear glasses until after his accident. At the time of the occurrence plaintiff was 26 years of age, had worked for the defendant nearly twelve months and had had an average monthly income on that job of about $230.00.

Upon the question of the amount of the damages we have carefully considered the cases cited in each brief, and have examined many cited in neither brief. To here discuss them would unduly extend this already long opinion. We find no case like this as to injuries sustained and probable future results, but no two cases will be alike. Attempting to maintain a standard of uniformity in judgments in personal injury cases presents vexing questions. We consider economic conditions, earning losses and all other pertinent factors. And each case must be considered upon its own facts. Plaintiff is a young man of high expectancy, but the record before us discloses he will have a future earning capacity. Under all the instant circumstances we believe this judgment is excessive, but that the rule of uniformity will be observed if the instant judgment finally stands for $27,500.

It is, therefore, ordered that if respondent-plaintiff, within ten days will enter a remittitur of $22,500 as of the date of judgment, then the judgment will be affirmed for $27,500 as of its date; otherwise the judgment will be reversed and the cause remanded. It is so ordered. All concur.