249 S.W.2d 335 (1952)
WARNING
v.
THOMPSON.
No. 42539.
Supreme Court of Missouri, Division No. 1.
May 12, 1952.
Motion for Rehearing or to Transfer to Denied June 9, 1952.
*336 Richard H. Beeson, David P. Dabbs, Dean F. Arnold, Kansas City, for appellant.
Trusty, Pugh & Green, S. L. Trusty, Guy W. Green, Jr., Kansas City, for respondent.
Motion for Rehearing or to Transfer to Court en Banc Denied June 9, 1952.
LOZIER, Commissioner.
This is a Boiler Inspection Act (herein called the Act) case. Secs. 22-34, 45 U.S.C.A. Plaintiff (herein called plaintiff) had a $60,000 verdict. To avoid sustention of defendant's motion for new trial, plaintiff remitted $15,000. Defendant (herein called defendant) appeals from the $45,000 judgment.
The issues here are: defendant's liability under the Act; causation; giving and refusal of instructions; admission of evidence; improper cross-examination and argument; and excessiveness.
The Act provides: "It shall be unlawful * * * to use * * * any locomotive unless said locomotive * * * and all parts and appurtenances thereof are in proper condition and safe to operate in the service to which the same are put, that the same may be employed in the active service * * * without unnecessary peril to life or limb, * * *." 45 U.S.C.A. § 23.
The appurtenance involved is the sanding apparatus. The one-ton capacity sand dome is on the boiler. The sand falls into two simultaneously operated sand traps on each side of the boiler. Within each are two traps for use in forward and backward movements, respectively. Each large trap has plugs in the side and, on the top, a hollow screw cap with an interior babbit. Inside the large trap is a compressed air *337 pipe. Air is controlled by a valve in the cab. The air forces the sand upward against the cap's ceiling, and then downward, through pipes, to the wheels.
Rule 120 of the Interstate Commerce Commission is: "Sanders.Locomotives shall be equipped with proper sanding apparatus which shall be maintained in safe and suitable condition for service, and tested before each trip. * * *"
Rule 120 does not create liability. The Act requires the I. C. C. to promulgate rules fixing standards of use of locomotives and their appurtenances. Such rules become integral parts of the Act. For our purposes here, after the promulgation of Rule 120, the Act itself read: "It shall be unlawful to use any locomotive which is not equipped with proper sanding apparatus or sanding apparatus which is not maintained in safe and suitable condition for service." See Lilly v. Grand Trunk Western R. Co., 317 U.S. 481, 63 S.Ct. 347, 87 L.Ed. 411; Urie v. Thompson, 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282.
Plaintiff had been defendant's employee for many years. On April 26, 1948, and for 3½ years prior thereto, he was engineer on a passenger train, the Sunflower, between Wichita, Kans., and Pleasant Hill, Mo. The distance is 237 miles. There were about 30 scheduled stops, 5 of which were between Pleasant Hill and Fort Scott, Kans. The others were between Fort Scott and Wichita. The Wichita-Pleasant Hill-Wichita run ordinarily used from one-half to two-thirds of the dome's sand capacity. The supply was not replenished at Pleasant Hill, where there were no facilities for such purpose.
Plaintiff used Engine No. 6420 (which he had used twice before in April) on the east run the night of April 24-25 and on the return run. He left Pleasant Hill about 10:10 p. m. April 25. It was not then raining, but started to rain before he reached the state line southwest of Rich Hill, Mo., and northeast of Fort Scott. There was a short shower, then a "pretty hard rain and it then turned into a drizzle or a mist and later into a fog."
Plaintiff noticed that the engine wheels were slipping in starting and locking in stopping. He used the air valve but "couldn't get any sand," although the air pressure was working. This "got worse on leaving Durand [Kans.]; I couldn't hardly do anything with the engine, she just slipped." Between Durand and Reece there was "moisture in the air and it was quite foggy from Eureka to Reece." During the Reece stop, he left open the air valve "and got down on the ground to see if there was any sand coming out * * * of the sand pipes that lead down to the rail. * * * There was some air coming out * * * [the air] was working all the time. * * * I went prepared [with an 18-20 inch wrench and a flashlight, as it was still dark]; I went along and tapped these pipes to see if any wet sand had got into the bottom of the pipes. They were open and there was a little air coming out, and I knew the only thing to do was to go up to the sand trap because it had to be wet up there, which was the only thing that would obstruct it. * * * When the sand [in the traps] gets wet it packs down and air will blow down in the way of the nozzle [in the traps] * * *; so there would be a small opening through which the air would go." After he tapped the pipes and "felt some air coming through * * * I started to go up over the pilot to get to the" catwalk and the sanders. "I went up that way * * * because the superintendent one time in a safety meeting said that was the safest way to go up there at any time. * * * I went up there to clean the wet sand out of the trap." The pilot's steps were wet and there were "considerable insects on the front of the engine." Plaintiff's gloves had become wet when he tapped the pipes. He was unable to grasp the smoke rail firmly, fell off the pilot and was injured. The evidence of both parties was that, when plaintiff fell, he was pursuing the customary and required method, viz.: leave the air on, tap the pipes (and remove any obstruction therein) and, if the sand still does not come through, climb over the pilot to the catwalk, unscrew the plugs and caps and eliminate the wet sand.
*338 Plaintiff did not claim that there was "any defect in this engine around the front where I fell, the pilot beam and in the vicinity on that engine * * * that is, so far as the pilot beam, the steps and those things are concerned, they were all right. The thing that caused me to slip or trip was the moisture or the bugs, the insects or my wet gloves, the combination of those things there at the time. * * * I started up there to go into the sand trap because I had checked the sand at the bottom and there was no sand coming out of the pipes. * * If the sand dome was empty, I wouldn't get any sand * * * but you would have a strong blast of air coming out of the pipe at the bottom, because there wouldn't be anything to obstruct the air at all from the time it left the air pipe [in the trap]. * * If there is a full blast of air coming out of the pipes at the bottom, then there is no sand in the dome; but if there is just a little bit of air coming out, it is because the wet sand has got the air obstructed in the trap and you know the sand is wet. * * * I looked under the engine and saw that there was no sand on the rail on the other [front] side. * * * There was no sand coming through at all. * * * I never actually saw into the dome * * * either before or after this thing occurred. * * * In my experience in wet weather with this class engine, with this engine, I have had to clean out the sand trap with wet sand and I knew in my mind it was wet."
In plaintiff's experience and to his knowledge, the air blows the sand against the cap; "that in time will wear the whole top of the plug out of the threads, clear off, * * * on the side where it blasts against it and the top." The sand gets on the threads and tends to "cut" them when the plugs are screwed or unscrewed. "This moisture gets in on account of the worn condition of the threads and caps."
Several retired engineers and a machinist corroborated plaintiff as to: sand eroding the cap and cutting the threads; sand becoming wet on a run; and the methods of testing to determine if the sand in the traps is wet and of removing such wet sand. So did defendant's employee witnesses. Everett, assistant master mechanic, had seen caps "with threads almost cut in two." Totten, who inspected sanders, had seen wet sand removed and defective caps repaired. Hotchkiss, who repaired sanders, had found sanders "stopped up" when he "was unable to find any leaks from the outside." Hotchkiss made the "outbound" inspection on Engine No. 6420 on April 24. Neither he nor Totten recalled any caps on that engine's sanders with holes in them. Hotchkiss and Everett made a special inspection of that engine's sanders on April 28. On both occasions, they "were working all right" and there were "no leaks" in the caps. That engine's sanders were inspected about 11:30 a. m., April 26, and "were working."
A hostler takes over the engine at the end of a run and drives it to the roundhouse. En route, the water, coal and sand are replenished. No record is kept of sand put in the dome. Inspection is then made at the roundhouse. The engine inspector makes an "outbound" inspection before the engine is taken out.
Defendant's records showed that, seven times between January 1, and April 24, 1948, engineers turning in Engine No. 6420 had signed reports to "clean out sanders," "open up sanders" or "check sanders." As plaintiff recalled, he had complained to Everett about that engine's sanders around April 19 or 20. Under a company rule, the engine inspector was required to enter "clean out sanders" on every work report. Totten said that he entered such orders as a matter of routine, even "if the sand was moving in the traps"; and that after plaintiff was injured, he (Totten) had been ordered not to make such entries, unless he found that "the traps were not working."
Defendant first contends that plaintiff did not make a submissible case in that the evidence did not show that the sanding apparatus on Engine No. 6420 was defective; and that defendant is not liable for the mere failure of the apparatus to function. There was ample evidence from which the jury could have inferred that the sanders' caps and plugs were defective, that the sand in the traps was wet and that the dome's sand supply was not exhausted. Compare Anderson v. Baltimore & O. R. Co., 2d Cir., 96 F.2d 796, 798, wherein the *339 railroad's evidence was that the sanders did not work because of insufficient air pressure, and it was said: "The failure of the apparatus gave rise to an inference of some defect, and whether that inference was overcome by the defendant's explanation was a question for the jury on all the evidence." In the instant case, the mere failure to function, in and of itself, was a defect under the Act and Rule 120. A sanding apparatus that fails to deliver sand to the rails, for any reason, is not a "proper" appurtenance or not one "maintained in safe or suitable condition for service." To hold otherwise would be to accord no meaning or effect to Rule 120. We hold that the jury could reasonably infer from the evidence that the sanders were not proper or were not maintained in a suitable condition for service.
Conceding that "under the Safety Appliance Act [45 U.S.C.A. § 1 et seq.] a plaintiff makes a submissible case by mere proof of failure of the appliance to operate," defendant contends that under the Boiler Inspection Act "the cause of action arises only from a defect in the locomotive." However, in the Lilly case, it was expressly held that the railroad's duty under the Boiler Inspection Act was absolute and not based upon negligence. And see Banta v. Union Pac. R. Co., 362 Mo. 421, 242 S.W.2d 34, 40, wherein we said of the Lilly case [317 U.S. 481, 63 S.Ct. 347.]: "That opinion of the United States Supreme Court extended the scope of the Act, and we are bound by it." In Urie v. Thompson, 352 Mo. 211, 176 S.W.2d 471, 475, we said: "Under the construction in the Lilly case, and many others, a sanding device or machine which is out of adjustment is an unsafe appliance, the very thing that the carrier, under the Boiler Inspection Act, insures against."
We believe that instant defendant's liability (for mere failure of the sanding apparatus to function) was ruled by the Supreme Court of the United States in Lilly v. Grand Trunk Western R. Co., supra. [317 U.S. 481, 63 S.Ct. 347.] Lilly slipped on an ice-coated tender top. There was evidence that the ice was formed by water leaking out of a defective manhole collar. I.C.C. Rule 153 required that the particular area be "kept clean, and means [be] provided to carry off waste water." The jury returned a general verdict for Lilly and answered in the negative the railroad's special interrogatory as to whether there was a "leak in or near the manhole collar". The state appellate court reversed Lilly's judgment.
The United States Supreme Court stated: "For our purposes the case resolves into two questions: (1) Granting, as the jury found, that the tender did not leak, could the jury nevertheless find that the Boiler Inspection Act was violated by the presence of ice on the tender's top; and, (2) Was the jury properly instructed that it might so find? We believe that both questions should be affirmatively answered * * *." As to the contention that the Act "covers only defects in construction or mechanical operation and affords no protection against the presence of dangerous objects or foreign matter", the court said: "But there is no warrant in the language of the Act for construing it so narrowly, or for denying the [Interstate Commerce] Commission power to remedy shortcomings, other than purely mechanical defects, which may make operation unsafe. The Act without limitation speaks of equipment `in proper condition and safe to operate * * * without unnecessary peril to life or limb'. Conditions other than mechanical imperfections can plainly render equipment unsafe to operate without unnecessary peril to life or limb."
In Anderson v. Baltimore & O. R. Co., 2d Cir., 89 F.2d 629, 630, the sanding apparatus failed to deliver sand to the rails. While preparing to tap the pipes, the fireman was struck by another engine and killed. The railroad contended that, "since the evidence shows without contradiction that the sanders worked both before and after the accident, their temporary failure could not have been due to any mechanical or functional defect but resulted from the clogging of the sand at the end of the pipes because of weather conditions. It was a rainy day in July, but the rain was not of unusual or extraordinary severity. When the rails are wet is the precise time when the sanders are needed, and the plaintiff argues *340 persuasively that an apparatus which will become clogged so that it cannot function during an ordinary summer rain does not comply with the rule [120] requiring a `proper sanding apparatus, which shall be maintained in safe and suitable condition for service.' * * * We think that the failure of the apparatus to function when operated in a proper manner and under normal working conditions makes a prima facie case of insufficiency either in the air pressure or in mechanical construction."
We hold that instant plaintiff made a submissible case as to the Act's violation. It follows that plaintiff's Instruction No. 1 was proper. The instruction submitted plaintiff's pleaded theory of defendant's absolute duty, under the Act and Rule 120, to maintain the sanders "in a safe and suitable condition for service and so the locomotive could be employed and used in active service on the trip in question without unnecessary peril to plaintiff or others on the train or to other employees"; and hypothesized facts predicating liability upon the mere failure of the sanders to function. Defendant says Banta v. Union Pac. R. Co., supra, "condemned" instructions of like import. However, in that case, the instructions were beyond the scope of the pleadings and the evidence and did not require a finding that defendant had violated the Act. That is not the situation here.
Defendant next contends that the failure of the sanders to deliver sand to the rails was not the proximate cause of plaintiff's injuries; "climbing up on the front of a locomotive is an ordinary act of an engineer in performing his regular duties. The same thing would have happened if he had been climbing up on the front of the locomotive to change the classification markers which was one of his ordinary duties as an engineer. Suppose plaintiff had mistakenly believed that the sand was not flowing when in fact it was. He would have fallen just the same in either event."
The employee may recover "if the failure to comply with the requirements of the [Safety Appliance] Act is a proximate cause of the accident, resulting in injury to him while in the discharge of his duty, although not engaged in an operation in which the safety appliances are specifically designed to furnish him protection." Davis v. Wolfe, 263 U.S. 239, 44 S.Ct. 64, 66, 68 L.Ed. 284, 287. If the defective appliance is either the sole or a contributing proximate cause of the injury, the defendant is liable. Coray v. Southern Pac. R. Co., 335 U.S. 520, 69 S.Ct. 275, 93 L.Ed. 208. See Eglsaer v. Scandrett, 7th Cir., 151 F.2d 562; Cassano v. Atchison, T. & S. F. Ry. Co., Mo.Sup., 247 S.W.2d 786.
"Liability of a railroad under the Safety Appliance Act for injuries inflicted as a result of the Act's violation follows from the unlawful use of prohibited defective equipment, `not from the position the employee may be in, or the work which he may be doing at the moment when he is injured.'" Coray v. Southern Pac. R. Co., supra. [335 U.S. 520, 69 S.Ct. 276.] In Smiley v. St. Louis-San Francisco Ry. Co., 359 Mo. 474, 222 S.W.2d 481, 486, we said: "The presence of plaintiff between the cars was an immediate cause of his injury. His presence there was induced and made necessary by the defective coupling. The direct cause of his presence there was the defective coupling. Except for the violation of the statute plaintiff would not have been there and the injury would not have occurred. * * * The use of this defective coupler required that plaintiff go between the cars to effect the coupling. We must decline to indulge in the refinement as to causation for which defendant contends to defeat the claims of natural justice. Here the violation of the statute was clearly the proximate cause of plaintiff's injury."
Instruction No. 1 submitted causation by requiring these findings: the failure of the sanders to function "was the cause of plaintiff being where he was when he fell; * * * he fell while getting onto or trying to get onto" the pilot; "he was going up to get to the sand traps to do work to get sand to go out of the sand traps and onto the rails by use of the air valve in the cab"; the failure of the sanding apparatus to function and his going up to get to the traps to get the sand to flow subjected him to a peril that would have *341 been unnecessary if, when he used the air valve in the cab, the traps would have functioned.
Thus the instruction hypothesized plaintiff's injuries as the direct result of his efforts to adjust the sanders. It was not, as defendant contends, "a departure from the established doctrine of proximate cause and a substitution in its stead of the mere occasion of plaintiff being where he was at the time of his injury." It clearly told the jury that, before they could return a plaintiff's verdict, they must find that the sanders were not functioning and that his injuries were the direct result of his efforts to get up to the catwalk to clean out the sand traps so that they would function. It was plaintiff's duty to go up on the catwalk and to try to get the sanders to function; and the customary and safest method to get to the catwalk was over the pilot. Plaintiff's presence at the place where he fell was no "mere occasion." Performance of his duties required him to be at that place, and his injury was the direct result of the failure of the sanders to function. We hold that there is direct causal connection between the failure of the sanders to function and plaintiff's injuries, and that the instruction was a proper submission of that issue.
We have examined the many cases cited by the parties wherein the negligent act or omission, or the defective appliance or locomotive appurtenance, was or was not held to have been a partial cause of the employee's injuries. Only one involved circumstances similar to the instant facts. In Anderson v. Baltimore & O. R. Co., 2d Cir., 89 F.2d 629, 630, the fireman was struck and killed by another engine while bending over to examine the pipes of the sanding apparatus which had failed to deliver sand to the rails. It was held that the causation issue should have been submitted to the jury. The court said:
"An employee cannot recover for a violation of the statutory duty to provide safety appliances, such as the Boiler Inspection Act requires, unless the failure to comply with the statute is a proximate cause of the accident which results in his injury; if it merely creates a condition or situation in which the accident happens from other causes, there is no liability. But, if a failure to comply with the requirements of the act is a proximate cause of the accident, resulting in injury to the employee while in the discharge of his duty, he can recover even though not engaged in an operation in which the safety appliances are specifically designed to furnish him protection. [Citing cases.] Whether in a given case the statutory violation is to be deemed the proximate cause, or merely a condition, of the accident is often a troublesome problem, and it is impossible to harmonize all of the many decisions on the subject. The defendant argues that Anderson's own act in placing himself in a position of danger where he would be struck by the Erie engine was the proximate cause of his death, and the defect in the sanders only a remote cause or condition of the accident. But the jury might reasonably find from the evidence that he had taken this position in an effort to remedy the defect and get the sand to flow * * * and that his conduct was a normal reaction to the stimulus of a situation created by the defendant's violation of its statutory duty. Granting that he was negligent in not observing the approaching engine, his contributory negligence does not preclude recovery in an action based on violation of the statutory duty, unless his act can be deemed a new and superseding cause of the accident. It is not considered as such when it is a normal reaction to the situation created by the defendant's wrong. [Citing cases.]"
Contrast Reetz v. Chicago & E. R. Co., 6 Cir., 46 F.2d 50, 52, distinguished in Anderson v. Baltimore & O. R. Co., 2d Cir., 89 F.2d 629, wherein the freight conductor, while walking forward to remedy a defective coupler-drawbar situation, fell from a bridge. It was held that the defective appliance created only an "incidental situation" and "bore no other relation to the injury." Also contrast Bohm *342 v. Chicago, M. & St. P. Ry. Co., 161 Minn. 74, 200 N.W. 804, 806, wherein the brakeman, while walking over and using ladders on cars of a slowly moving freight train to "bleed" defective brakes at night, stepped off a ladder and fell through a bridge. It was held that the defective brakes "had no direct causal connection with the fact that he `stepped out into space'."
Defendant next contends that plaintiff's instruction No. 2 comments favorably, and his Instruction No. 3 unfavorably, upon the legal effect of plaintiff's evidence, and that both emphasize the facts hypothesized in Instruction No. 1. Defendant cites cases holding that such comments and such emphasis are erroneous, but does not point out, and our examination fails to disclose, wherein either instruction violates these rules.
Defendant contends that Instruction No. 6 (measure of damages) is erroneous in that it mentions the amount sued for and "there was no evidence to support a verdict" for such an amount. The instruction contained this direction: "Your whole award, if you so find, should be stated in one lump sum and in no event can your award exceed the sum of One Hundred Twenty-Five Thousand Dollars ($125,000.00), the amount sued for. In mentioning this amount the court does not mean to direct you to find for the plaintiff in that sum, or in any sum, but merely mentions the amount claimed." We do not commend mention of the amount sued for in a measure of damages instruction. And under some circumstances, such mention might justify either refusal of the instruction or a new trial where the instruction was given. Jones v. Central States Oil Co., 350 Mo. 91, 164 S.W.2d 914. However, the instant mention was not prejudicially erroneous. Defendant did not object to plaintiff's counsel's mention of the amount sued for in his opening statement. (The mention followed an outline of what plaintiff's evidence as to injuries would be. Such evidence was, generally, as outlined in the opening statement.) The $60,000 verdict was less than half the amount mentioned. The trial court ordered a $15,000 remittitur, and, as will appear, the $45,000 judgment was not excessive. Compare Cuddy v. Schenewark, Mo.Sup., 231 S.W.2d 689; Jones v. Central States Oil Co., supra.
Defendant also says that Instruction No. 6 is argumentative, confusing and repetitious. The first paragraph of that instruction authorizes allowance of such sum as "will reasonably and fairly represent the pecuniary value of such damages" plaintiff "has sustained to date and such as you find from the evidence he is reasonably certain to sustain in the future as a direct result of such injury and physical disability * * *." The second paragraph reads: "In considering and determining the amount of such sum," the jury should consider physical pain and mental anguish "to date" and in the future. The third paragraph reads: "Also, you should take into consideration" lost earnings "to date." The fourth paragraph reads: "Also you should take into consideration" future earnings; "also" damages for "permanency of injury." The words we have italicized clearly show that the instruction does not "double" the amounts allowed for the items mentioned in the second, third and fourth paragraphs, respectively. The elements of damage detailed in the latter paragraphs are carefully made parts of, not additions to, the measure of damages generally stated in the first paragraph.
Defendant next complains of the refusal of his Instruction E: If the failure of the sanders to function was due solely to exhaustion of the dome's sand supply, plaintiff was not entitled to recover. As there was no evidence tending to show that the dome was empty, refusal of the instruction was proper. We need not determine the propriety of the refusal had there been such evidence.
Defendant next alleges error in the admission of the testimony of several retired engineers that, when they worked for defendant, worn and defective plugs and caps caused wet sand in sand traps of locomotives other than Engine No. 6420. All had operated engines equipped with the *343 same type of sanders as was Engine No. 6420. One definitely recalled operating that engine and others believed that they had. Their expert testimony as to the effect of wet sand in this type of sanders was corroborated by defendant's witnesses. Engine No. 6420's sanders were not produced, but defendant's Exhibit F was offered and received as a duplicate of the sanding device on Engine No. 6420 in April, 1948. The testimony of plaintiff's witnesses was admissible as "evidence of the `tendency, capacity, or quality of a material object'" and "of its operation under conditions essentially similar to those surrounding the particular operation in controversy, and, in proper circumstances * * * of the operation of like objects or machinery under like conditions." Lake Superior Loader Co. v. Huttig Lead & Zinc Co., 305 Mo. 130, 264 S.W. 396, 399.
In cross-examining a witness for defendant as to prior inconsistent statements, plaintiff's counsel said: "You have been attending classes back here in the probate court room with these two gentlemen [defendant's counsel] before and after court for about four days, haven't you?" Defendant's motion to discharge the jury was denied but the court directed the jury to "disregard the statement about attending classes." In the colloquy that followed, the court and plaintiff's counsel made clear that "there was nothing wrong with defendant's counsel talking to his witnesses," and that plaintiff's counsel was not insinuating that there was. In his jury argument, plaintiff's counsel was discussing the amount of damages. He said: "Then, look down into the future and do your very, very best as you would have others do unto you under similar circumstances." Defendant's counsel moved that the jury be discharged. The court overruled the motion but directed the jury to disregard the statement.
We shall assume without deciding that the question asked by plaintiff's counsel and his argument (invoking the Golden Rule) were improper. However, as the trial court directed the jury to disregard such question and such argument, it did not abuse its discretion in refusing to declare a mistrial. "Such matters rest largely within the discretion of the trial court." McGinley v. St. Louis Public Service Co., Mo.Sup., 239 S.W.2d 321, 324. "We are inclined to accept his ruling on the motion for new trial in view of what we find in this record." Crews v. Kansas City Public Service Co., 341 Mo. 1090, 111 S.W.2d 54, 62. See Schwinegruber v. St. Louis Public Service Co., Mo.App., 241 S.W.2d 782.
Defendant next contends that plaintiff's Instruction No. 4 "nullified" defendant's Instruction A, and directed a plaintiff's verdict "on the notion of the jury as to what constitutes the `burden of proof.'" Instruction A was that defendant was "not required to disprove plaintiff's charge as submitted in Instruction No. 1," and that it was plaintiff's burden to prove "such charge by the preponderance, that is, the greater weight of all the credible evidence." Instruction No. 4 was that Instruction A was a burden of proof instruction; "now as to this proposition of burden of proof, if you find and believe from the greater weight of the credible evidence the facts and issues in favor of plaintiff as submitted in Instruction No. 1," then "plaintiff had so met and carried the burden of proof required under the law and under the instructions and to find for plaintiff." Defendant says that "this court warned against a similar instruction in Davis v. Kansas City Public Service Co., Mo.Sup., 233 S.W.2d 679." However, that "warning" was: the instruction was not prejudicially erroneous; while it "may have minimized the emphasis and force" of defendant's burden of proof instruction, "it did not deprive the defendant of its benefit"; and while "not a model and the court could have refused it, * * * the court gave the instruction and passed upon the prejudicial effect of its deficiencies when it overruled the motion for a new trial." We make the same ruling as to instant Instruction No. 4.
Plaintiff's injuries were: fracture and subsequent calcification and weakening of the joint of the odontoid process; fracture and subsequent displacement of the body of the second cervical vertebra; and, in all probability, a *344 damaged spinal cord. His neck movement is limited by callus formation, strained ligaments, synovial membrane and a fibrous condition of torn and strained facets. His neck is fixed slightly to the left and has no up-and-down movement; the lateral movement is painful. He has constant pain in his neck and this is aggravated if he unexpectedly twists it. The fracture may increase the possibilities of a subsequent break in the odontoid process. Injury to both motor and sensory nerves to his left side is indicated. There is impaired sensation in the left side of his face, head, shoulder and body and his left leg; the muscles in his left arm and hand are atrophied. His ability to speak is affected. He is uncertain in step and his legs "buckle" at times. He has to "go sideways" up and down steps or along a curbing in order to protect his neck from "jars." After the accident, constantly for about six months and thereafter intermittently, he wore a metal collar which kept his neck in alignment and prevented head movement. He usually had to sleep sitting in a chair. He still sleeps in a chair when his legs cramp. Plaintiff has suffered much physical pain and, apparently for the rest of his life, will continue to have constant pain in his neck and the left side of his head, face and body and his left shoulder and leg. For months, he suffered very intense pain. To relieve pressure on the spinal cord, two holes were bored (without use of anesthetic) in his skull. Traction was applied by tongs through the holes and for about a month he laid in a hospital bed, his head in traction and lower than his feet.
The undisputed medical testimony was that plaintiff was totally and permanently disabled from any form of manual labor. Defendant concedes that plaintiff is permanently disabled from performing the work of a railroad engineer. Plaintiff's monthly wages averaged $477.33. (Shortly after his injury, the rate was increased about $50 a month.) His loss of earnings to trial time was approximately $14,800. His medical expenses were $208. At trial time he was 65 years old and had a life expectancy of 11.55 years.
As to excessiveness, defendant cites: Smiley v. St. Louis-S. F. Ry. Co., 359 Mo. 474, 222 S.W.2d 481; O'Brien v. Louisville & N. R. Co., 360 Mo. 229, 227 S.W.2d 690; Hayes v. Wabash Railroad Co., 360 Mo. 1223, 233 S.W.2d 12; Osburn v. K. C. So. Ry. Co., 360 Mo. 813, 230 S.W.2d 856; Counts v. Thompson, 359 Mo. 485, 222 S.W.2d 487; Hilton v. Thompson, 360 Mo. 177, 227 S.W.2d 675; Abernathy v. St. Louis-S. F. Ry. Co., Mo., 237 S.W.2d 161; Aly v. Terminal R. Ass'n. of St. Louis, 342 Mo. 1116, 119 S.W.2d 363; Prince v. Kansas City So. Ry. Co., 360 Mo. 580, 229 S.W.2d 568. Among plaintiff's cited cases are: Cruce v. Gulf, M. & O. R. Co., 361 Mo. 1138, 238 S.W.2d 674; Joice v. Missouri, K. & T. R. Co., 354 Mo. 439, 189 S.W.2d 568, 161 A.L.R. 383. Both parties cite Tatum v. Gulf, M. & O. R. Co., 359 Mo. 709, 223 S.W.2d 418. We have examined these cases. Many are referred to in Cassano v. Atchison, T. & S. F. Ry. Co., supra. No useful purpose will be served by summarizing them or comparing them with the instant facts.
Considering the extent, nature and permanency of plaintiff's injuries, his pain and suffering, and past and future loss of earnings, and the fact that the trial court ordered a remittitur, we cannot say that the judgment was excessive.
The judgment is affirmed.
VAN OSDOL and COIL, CC., concur.
PER CURIAM.
The foregoing opinion by LOZIER, C., is adopted as the opinion of the court.
All concur.