**ALEXANDER**

v.

**KANSAS CITY PUBLIC SERVICE CO.**

No. 21905.

Kansas City Court of Appeals.

Missouri.

April 5, 1954.

452

Charles L. Carr, E. E. Thompson, Sam Mandell, Popham, Thompson, Popham, Mandell & Trusty, Kansas City, for appellant.

Maurice J. O'Sullivan, John G. Killiger, Jr., Kansas City, for respondent.

BROADDUS, Judge.

This is an action for damages for personal injuries. There was a verdict and judgment in favor of plaintiff in the sum of $3,000. Defendant has appealed.

The facts are: About 7 p. m. on December 18, 1949, plaintiff, then about 42 years of age, and who had been a city ambulance driver since 1946, received an emergency call to go to 16th and Summit Streets in Kansas City, Missouri. He and a doctor got into the ambulance, a one-half ton Ford panel truck painted white, with red fenders and red trimmings with plaintiff driving. The ambulance had a red light mounted on a bracket at the front and a siren was mounted on the left front fender. The siren is operated by a foot button on the floor-board and will operate for 3 or 4 minutes after foot pressure is removed from the button. It was a nice clear evening, and at that time of the year night had fallen. As plaintiff left the General Hospital, all of the lights, including the red light, were on and the siren was sounding. He drove north to 20th Street and there turned west.

Twentieth Street, running east and west, is 77 feet in width with a raised medial strip 4 or 5 feet wide, down its center. Main Street is 55 feet wide and has two sets of street car tracks. Walnut Street is the first street east of Main, and both run north and south. A railroad track crosses 20th Street at about the alley between Walnut and Main Streets. It is about 100 to 125 feet from the alley to the east curb of Main Street. The intersection of 20th and Main was controlled by traffic signals. All of the witnesses agreed that the intersection was well lighted.

Plaintiff was proceeding west on 20th Street in a straight line, about 4 or 5 feet north of the medial strip. When he was about at the alley between Walnut and Main, traveling 25 to 30 miles per hour, he looked to the left and saw the streetcar, with which he later collided, standing some 3 or 4 feet south of the south curbline of 20th Street. At that time the traffic light facing him was green, for east and west traffic. He then looked back toward the right or north to watch for traffic there. No traffic was moving. As he got closer to Main Street, he put his foot on the brakes and slowed down so that when he got approximately to the east curbline of Main Street, his speed was 10 to 15 miles per hour. At that time he looked to his left and saw the streetcar moving north in the intersection, its speed about 10 miles per hour, and its front end to the south of the medial strip, "not quite in the medial strip." Plaintiff shoved the brake pedal down further and tried to pull the wheel to the right to run the ambulance off to the right to miss the streetcar. The right front of the streetcar and the left front of the ambulance collided. Plaintiff's speed at the moment of the impact was between 5 and 6 miles per hour. The streetcar did not change its speed until the impact occurred. Plaintiff was thrown to the pavement and rendered unconscious.

Plaintiff's witness, Harold Todd, a cab driver, testified that he had been driving north on Main Street and stopped alongside the streetcar at 20th Street because of the red traffic light facing him; both vehicles stopped 3 or 4 feet south of the south curbline of 20th Street; that he heard the siren and saw the ambulance about two blocks to the east; that the streetcar started on the amber light; that at the time the streetcar started the ambulance was at about the alley between Main and Walnut Streets, 100 to 125 feet east of the east curbline of Main Street; that the streetcar was at about the middle of the intersection when the ambulance entered the intersection; as the witness put it, "I thought he was going to stop in the middle to let the ambulance go on by," but "he didn't;" that the streetcar was about three-fourths of the way across 20th Street when the colli-

sion occurred; the ambulance was going around 25 miles per hour from the alley to the intersection; its speed slowed down to 20 miles an hour when the collision occurred; the speed of the streetcar was from 7 to 10 miles per hour; he saw no change in its speed across the intersection. Witness did not move his cab until after the collision. He then drove across the intersection to the ambulance; he saw plaintiff lying on the pavement bleeding and unconscious; witness got in the ambulance, turned off its red light and called over the radio for another ambulance.

Another witness, Irving Rowe, testified he was driving south on Main Street and had stopped north of 20th Street for the red light; that as the light turned green he heard the siren and stopped; that he did not see the ambulance and did not know whether its red light was on or not; that the streetcar approached from the south and the impact occurred; the front end of the streetcar was about 10 feet north of the medial strip at the time of the collision; he did not see the impact between the vehicles because "the streetcar was between me and the ambulance;" that plaintiff was thrown out of the ambulance by the collision, and was lying in the street about 10 feet from the ambulance.

Edward Hilton testified that on the date of the accident he was a patrolman assigned to the accident investigation unit and went to 20th and Main Streets in response to a call. He found debris 18 feet west of the east curbline of Main Street, 52 feet north of the south curbline of 20th Street, 85 feet from the point where the front end of the streetcar stopped and about 45 feet from where the ambulance stopped. The front trunk of the streetcar was to the west, off the rails, the ambulance headed northeast on the northeast corner.

Harrison Junior O'Dell, the operator of the streetcar, testified that he did not hear the siren "until I was about three-fourths of the way across the street;" that prior to that time he had not seen the ambulance approaching; that when he heard the siren the ambulance was then about 30 feet away, or about 12 feet from the east curbline of Main Street. Witness stated that at a speed of 7 miles per hour the streetcar could have been stopped within 15 to 20 feet; at 10 miles per hour within 20 to 30 feet.

Defendant's first contention is that the court erred in refusing to sustain its motion for a directed verdict at the close of all the evidence. The case was submitted solely on the humanitarian doctrine. Defendant says there was no evidence showing that the motorman could have stopped or slackened the speed of the streetcar after plaintiff's peril arose; that plaintiff was not in imminent peril until he was "approximately 26 feet east of the east rail or about 6 feet east of the east curb of Main Street." With the latter statement we do not agree.

Ordinarily, where the imminent peril zone begins is a question for the jury. Pennington v. Weis, 353 Mo. 750, 184 S.W. 2d 416; Johnson v. Hurck Delivery Service, 353 Mo. 1207, 187 S.W.2d 200 and, under the humanitarian rule, the zone of imminent peril is always widened beyond the immediate path of a moving vehicle by the obliviousness of a person approaching its path. Crews v. Kansas City Public Service Co., 341 Mo. 1090, 111 S.W.2d 54. In the latter case it was held that the danger zone could widen to more than 100 feet. In State ex rel. Thompson v. Shain, 349 Mo. 27, 34, 159 S.W.2d 582, 586, the court said: "* * * if a plaintiff is approaching the pathway of the defendant on a course which, unless he stops, will produce a collision and if he is at the time oblivious to the presence and approach of the defendant, this in itself will cause him to be in position of peril * * *."

The testimony shows that plaintiff was not aware that the streetcar had moved from its stationary position south of 20th Street until he reached the east line of Main Street. It was then too late for him to stop. Because it was the duty of the defendant's motorman to have been on the lookout, he had constructive notice of the approach of the ambulance. It was his

duty to act upon reasonable appearances of obliviousness at a time when such action would be effective. He had no right to assume that plaintiff would stop before going on the track. Plaintiff was operating an emergency vehicle. Its siren was sounding, its red light was flashing. Plaintiff had the right-of-way both by reason of the ordinance offered in evidence, and under the common law. Hogan v. Fleming, 218 Mo.App. 172, 183, 265 S.W. 875; Taylor v. Metropolitan St. Railroad Co., 166 Mo.App. 131, 148 S.W. 470; Green v. United Railways Co., 165 Mo.App. 14, 145 S.W. 861. In Nolan v. Kansas City Rys. Co., Mo.App., 247 S.W. 429, a case where the facts were somewhat similar to those in the case at bar, we held that a case was made for the jury under the humanitarian doctrine. And we so hold in the instant case.

■ Defendant's next point is that Instruction No. 2 erroneously directed the jury to allow plaintiff double damages. The Instruction authorized the jury to *"allow* plaintiff such sum as you find and believe from the evidence will fairly and reasonably compensate him *for the injuries,* if any, he sustained as a *direct* result of the collision mentioned in evidence, *and* you may *further allow* him such sum as you find and believe from the evidence will fairly and reasonably compensate him for such aggravation or intensification of a previous existing abnormal condition, if you find such condition to have existed and to have been intensified or aggravated." (Emphasis ours)

We think defendant's contention is well taken. It is to be seen that the first portion of the instruction authorizes the jury to compensate plaintiff for *"the injuries"* sustained as a *"direct result"* of the collision.

This necessarily embraced any aggravation or intensification of any previously existing abnormal condition. In spite of that fact, the instruction goes on to say *"and* you may *further* allow" etc. Our holding finds support in the case of Ingram v. Great Lakes Pipe Line Co., Mo.App., 153 S.W.2d 547 and Murphy v. St. Louis Public Service Co., 362 Mo. 772, 244 S.W.2d 31. Plaintiff refers us to the case of Mathew v. Wabash Ry. Co., 115 Mo.App. 468, 78 S.W. 271, 81 S.W. 646. The instruction approved in that case is different from the one now before us.

Defendant's next point is that there was no evidence showing aggravation or intensification of a previously existing abnormal condition. There is no question that an abnormal condition had existed in plaintiff's neck since birth. In our opinion, from the evidence, the jury could reasonably have inferred that the disability appearing in plaintiff's neck following the accident was the result of an aggravation of that pre-existing abnormality.

Defendant's last assignment is that the verdict is excessive. This we need not discuss.

Since no error appears except such as relates to the amount of damages, only that issue should be retried. Wilson v. Kansas City Public Service Co., 254 Mo. 1032, 193 S.W.2d 5, 9, 10; Spalding v. Robertson, 357 Mo. 37, 206 S.W.2d 517, 523.

The judgment is reversed and the cause remanded with directions to retry only the issue as to the amount of damages, and then enter judgment for whatever amount may be found. It is so ordered.

All concur.