Lawrence MOSS, Respondent,

v.

MINDLIN'S, Incorporated, a Missouri Corporation, Appellant.

No. 45108.

Supreme Court of Missouri,

Division No. 1.

Dec. 10, 1956.

Transferred to Court en Banc Jan. 14, 1957.

Remanded in Division No. 1 May 13, 1957.

Richard H. Beeson, David P. Dabbs, Dean F. Arnold, Kansas City, for appellant.

Lyman Field, Rogers, Field, Gentry & Jackson, Marvin P. Richmond, Kansas City, Charles L. Carr, Kansas City, of counsel, for respondent.

COIL, Commissioner.

Lawrence Moss was injured when he fell on the floor of Mindlin's, Inc., a retail store in Kansas City, shortly after he had departed from an elevator. He obtained a judgment for $50,000 and Mindlin's appealed therefrom.

Plaintiff's evidence was that defendant's employee pushed a hand truck (referred to as a dolly) into plaintiff's right ankle as plaintiff walked from the elevator. Defendant's evidence was that its employee with the dolly remained stationary and that plaintiff fell when his feet entangled with each other, contributed to by the fact that he was, as he turned partially to his right, looking over his left shoulder at live models who were then in the process of showing sportswear in the store. The dolly was a wood platform about 2½ x 5 feet resting on four wheels about 6 inches high. One end of the platform was open; at the other were three steel bars, above the topmost of which was a handle bar (about 3 feet from the floor) by which the dolly could be propelled.

Defendant contends the trial court erred in overruling its motion to discharge the jury on the ground that plaintiff's counsel in jury argument prejudicially injected the fact of defendant's insurance coverage. It appears to have been conceded that Central Surety & Insurance Corporation was interested in the defense of the action. Without objection, plaintiff's voir dire examination included the usual questions concerning connection with that company and acquaintance with certain of its employees. Insurance was not mentioned during plaintiff's case. Defendant's John McNutt, whom plaintiff claimed pushed the dolly into him, testified on cross-examination that he had met defendant's trial counsel two weeks preceding the trial and volunteered that such counsel had not talked with him when the accident happened. Plaintiff's counsel disclaimed any implication that defendant's trial counsel was present at the time of the accident, whereupon the witness volunteered, without objection and without subsequent motion to strike: "No, I mean he was not the insurance man, you know, that came, the lawyer that came, I mean at the time when this happened."

Plaintiff's counsel later brought out by extensive cross-examination that the pictures which showed defendant's claim as to the position of the witness and dolly at accident time were posed pictures taken five days subsequent to the fall when plaintiff was in the hospital and at a time when no claim had been made against defendant; and, in that connection, pressed for an answer as to why it was that, as defendant at that time claimed that the dolly was not involved in any way and no claim had been

made that it was, the dolly was nevertheless made a part of the picture. On redirect, defendant's counsel brought out, over an objection that the question was repetitious, that at the time the two photographs were taken the witness McNutt was "requested to place the dolly in exactly the position it was when Mr. Moss fell." Immediately thereafter on recross-examination plaintiff's counsel inquired as to the identity of the person who had requested witness to place the dolly in that position, and witness replied that it was "The lawyer for the insurance firm." Plaintiff's counsel then inquired why it was that the "lawyer for the insurance firm" was anxious to get the dolly in the picture when the dolly had nothing to do with the fall according to the defendant. And again plaintiff's counsel inquired why another employee whom witness McNutt said was standing at the other side of the elevator entrance at the time of the fall, was not posed in the picture if it was an exact reproduction of the conditions as they existed at the time of the fall. In the course of that examination one of the questions included the statement "When the insurance lawyer * * * took it [the picture] five days after the fall."

There was no objection to any of those questions or answers and there were no motions to strike any of the answers. Thereafter, at a conference in chambers, defendant's counsel admitted that Mr. Windsor, an investigator for Central Surety, had investigated the instant accident, had procured the services of a photographer, and that the pictures were taken when Mr. Windsor was present. Defendant's counsel suggested to the court that while he had made no objection or motion to discharge the jury because of the mention of insurance for the reason that in his view the matter thus far had come into the case inadvertently, he thought that the rest of the case should be conducted without mention of insurance. The trial court took the position that there was nothing before it on which to rule, and plaintiff's

counsel, while refusing to agree that he would not again mention insurance, nevertheless indicated that he did not intend to so frame his future questions as to unduly emphasize the fact of insurance. The court indicated that he would rule any specific matter in that connection when and if it arose. There was no further mention of insurance during the examination of any other witness.

During jury argument plaintiff's counsel was attacking the credibility of the witness McNutt as to his testimony that he had always pulled the dolly and had not pushed it because he had a sore stomach. Plaintiff's counsel argued that if it were true that at the time of the accident the dolly was in the position shown in the photograph, that is, stationary with McNutt standing in front of and with his back to the handle bar and thus with the entire dolly behind him, and if it were true that, as defendant claimed, plaintiff had fallen simply because he "got all tangled up in his feet, then, * * * why on earth was it necessary to pose these pictures while he [plaintiff] was still in the hospital only five days after the fall? Why did the insurance company, as McNutt admitted, have these pictures posed?"

Out of the jury's hearing, defendant objected and moved a mistrial on the ground that the statement was an intentional and prejudicial injection of the fact of defendant's insurance coverage and constituted an argument against the insurance company. The trial court overruled the objection and commented that defendant's witness had brought out the fact of insurance investigation on examination by defendant's counsel, that there had been considerable examination about it without objection, and that the instant objection came too late. Immediately thereafter, plaintiff's counsel resumed his argument and said, "And I say to you, ladies and gentlemen, when the insurance lawyer or man, as John McNutt says, took these pictures, * * * he was preserving evidence at that time envisioning a trial, and * * * why didn't

you have some pictures taken and posed by the insurance man that he said was there that showed a close up of the floor at the place where he fell to show that the linoleum wasn't uneven, that there wasn't any dirt there or stain or obstruction?" And in closing argument, plaintiff's counsel, in arguing that the entire case had been "shaped up," said that the first step in the "shaping-up" process began "with these phony pictures that the insurance lawyer took within five days of the accident—no claim, no nothing made, man out in the hospital, he got the dolly truck in there. That is when the shape up starts."

■ It is at once apparent that the argument made by plaintiff's counsel wherein he referred to insurance company, insurance lawyer and man, was an exact reference to the testimony in that respect which had come into the case without objection. The fact, however, that the evidence had come in without objection, if it was wholly irrelevant and immaterial for any purpose, would not justify the use of such evidence in making an unfair and prejudicial argument. Amsinger v. Najim, 335 Mo. 528, 532, 533, 73 S.W.2d 214, 216. In our view we need not rule whether the evidence at the time offered was relevant and material upon the credibility of the witness McNutt and upon the weight to be given the crucial pictorial evidence. It may be observed, however, that if McNutt's testimony as to the correctness of the picture was true, plaintiff could not recover, and thus it was proper for plaintiff's counsel to probe the verity not only of the witness' statements but to examine into the circumstances under which the pictures had been taken, and in that connection show that the pictures had been taken under the supervision of one who was financially interested in defeating plaintiff's claim. It may be that the jury was entitled to draw the inference that because the picture was posed under the supervision of an insurance company representative, it did not truthfully portray the witness' position with the dolly at the time of the accident but, on the contrary, por-trayed only the supervisor's idea. Was the insurance company's supervision an act which "might influence or color the evidence on the merits" and thus make the disclosure that the supervisor was an employee of the covering insurance company relevant and material? Buehler v. Festus Mercantile Co., 343 Mo. 139, 157, 119 S.W. 2d 961, 969 [9]. On the contrary, of course, it may be said that even though plaintiff could show that the pictures were taken under the supervision of defendant's agent, his interest would appear from the fact that he was defendant's agent, and the fact that he was also the employee of the investigating insurance carrier would add nothing to affect the credibility of the picture. But see Clayton v. St. Louis Public Service Co., Mo.App., 276 S.W.2d 621, 624 [1, 2].

■ As noted, however, we do not rule that question. That is because it seems apparent to us that plaintiff's counsel's argument accomplished nothing more than to remind the jury of unobjected-to evidence which was already extensively before it. The argument gave the jury no further information than that which had been forcefully brought to its attention during the trial. To say that reminding the jury in an accurate manner of that evidence, in connection with an argument directed to the issue of liability (not damages), could have prejudiced the defendant to any greater extent than it had been prejudiced by the evidence it had heard, is, in our judgment, an unrealistic and unsound view. We point out that the argument in question was not made on the damage issue or in connection with the size of the verdict, and that it did not imply that a liability insurance carrier would pay any verdict returned. It was not, as in Buehler v. Festus Mercantile Co., supra, 119 S.W.2d 969 [10], "a direct appeal to the jury to return a $50,000 verdict because it would be paid by someone else." It was not, as in Phillips v. Vrooman, Mo., 251 S.W.2d 626, 630, to the effect that a verdict in the case would not hurt the defendants a particle. And

this is not a case like Rytersky v. O'Brine, 335 Mo. 22, 70 S.W.2d 538, wherein there was no unobjected-to evidence before the jury showing insurance coverage or investigation.

As heretofore noted, the first mention of insurance occurred on cross and recross-examination of defendant's witness by plaintiff's counsel. It may be that the trial court ruled at the time on the mistaken assumption that defendant's counsel had elicited the answer. The fact remains, however, that, as noted, we are unable to perceive, under all the circumstances of the instant case, how prejudice to defendant was increased by the argument.

Defendant contends that the trial court erred in overruling its objection to another portion of plaintiff's jury argument. Defendant's employee-witness, Edna Stark, testified on cross-examination that the dolly at the time of the accident was "kind of slanting on an angle more north and south than east and west" and that "the low bed of the dolly truck was kind of slanting out into the aisle." While Edna Stark agreed with the other defendant's witnesses that the dolly had had nothing to do with plaintiff's fall, nevertheless her testimony was contrary to defendant's other witnesses as to the position of the dolly at the time of the fall. The others testified that the dolly was away from the aisle leading to, and close to and parallel with the wall immediately adjacent to, the elevator entrance. Part of defendant's argument was directed to the proposition that the mere fact that defendant's witnesses were employees was no reason to suppose that they would "lie to save their jobs." In that connection, counsel commented on the testimony of each witness. As to Edna Stark, he asked, "Do you doubt that girl's veracity? Do you think that girl would lie?"

As heretofore noted, it was plaintiff's sole recovery theory that the dolly was pushed into plaintiff causing him to fall. Defendant's instruction 5 told the jury that if it found "that John McNutt did not push the hand truck, mentioned in evidence, into plaintiff, then your verdict must be in favor of defendant."

With that background, plaintiff's counsel in closing argument pointed out that in his view, Edna Stark was the only defendant's witness who would not go along with the idea that the crucial picture was entirely accurate and suggested that the reason defendant's counsel said so little about Edna Stark in his argument, and the reason he had not had her examine the picture when she was on the stand, was "Because on cross examination I brought out from her that it was her recollection that this dolly truck was kind of slanting-wise, she said, more north than south. Oh, how that hurt him, and he didn't want that brought out. Do you remember that? 'Kind of slanting-wise, more north than south,' that would sure trip a man, wouldn't it? Oh, boy, how that hurt him. Edna Stark wasn't that suggestive."

Defendant objected to that argument and moved that the jury be instructed to disregard it on the ground that it was in fact an argument that plaintiff "tripped on the dolly while [it was] standing still" and thus was outside the issues. The court commented that he had instructed the jury in writing on all issues and that the jury would understand that those instructions represented the law of the case. Defendant's restated objection that the argument was outside the submitted issues was overruled.

█ Defendant here correctly contends that jury arguments which are outside the submitted issues and calculated to mislead and prejudice, or which urge a theory of claim or defense which the evidence does not justify, or which conflict with the trial court's instructions in submitting the issues, should not be permitted. Robbins v. Brown-Strauss Corp., 363 Mo. 1157, 1166 [2], 257 S.W.2d 643, 648 [4–6]; Schrader v. Kessler, Mo., 178 S.W.2d 355, 357 [2]. Thus, if the instant argument was reasonably subject only to the construction that it in effect told the jury *that plaintiff could*

*recover if he tripped over the stationary dolly*, and was thus contrary to plaintiff's submitted theory of recovery and contrary to and in conflict with defendant's instruction 5, there would be merit in defendant's contention.

■ We are of the opinion, however, that defendant's construction of the argument in question is an unlikely one. We think a reasonable construction of it was that it constituted an attack upon defense testimony as to the accuracy of the pictures. In any event, we are clear that the construction we have suggested was not an unreasonable one. The trial court therefore, in ruling the pertinent assignment in defendant's new trial motion, considered the language used and interpreted it in the light of the circumstances of the particular case and was of the opinion that the argument would not be understood by the jury as meaning that which the defendant now contends. Stroh v. Johns, Mo., 264 S.W. 2d 304, 306, 307. Stroh v. Johns and Robbins v. Brown-Strauss, supra, were cases in which the trial courts had granted new trials on the ground that the particular arguments were outside the issues and urged theories of recovery or defense which were not justified by the evidence and which were in conflict with the trial courts' instructions submitting the issues. We affirmed the new trial orders in those cases on the ground that in neither had the trial court abused its discretion in holding that the arguments there reasonably could have been construed as objectionable and their over-all effect prejudicial. In the instant case the trial court refused a new trial. Under the circumstances, we hold that the trial court, in a favorable position to gauge and judge the effect of a particular argument, did not abuse its discretion in holding that plaintiff's argument in the instant case did not carry the implication ascribed to it and was not for that reason prejudicial to defendant.

■ Defendant contends that the trial court erred in giving plaintiff's instruction 1. That instruction, inter alia, required a finding that plaintiff "was at all times in the exercise of ordinary care for his own safety." Defendant's instruction 6 told the jury to find for defendant if plaintiff was not watching where he was walking and was thereby proximately negligent. Defendant here contends that instruction 1 was erroneous because it relieved the jury of its duty to make a specific converse finding on the particular issue submitted by defendant's instruction 6, and because it thereby gave the jury a roving commission to find the plaintiff free of any contributory negligence.

It would appear, however, that the failure of instruction 1 to have limited plaintiff's freedom from contributory negligence to a finding on the specific issue (failure to watch where he was walking) submitted in instruction 6 was favorable to defendant. That must be true because under instruction 1 the jury had to find that the plaintiff was not contributorily negligent either in that respect or in any other the jury might imagine. Defendant may not successfully complain of such a favorable submission.

Defendant contends that the trial court erred in giving plaintiff's instruction 7. Instruction 7 was a burden of proof instruction on contributory negligence. It referred to defendant's claim that plaintiff was guilty of contributory negligence and told the jury that the burden was on defendant to prove that plaintiff was guilty of "such contributory negligence" and that unless defendant had done so, the jury finding on *that issue* must be for plaintiff. We cannot agree with defendant that instruction 7 was or was intended to be an instruction conversing defendant's contributory negligence instruction. Nor can we agree that the instruction was erroneous because it did not require specific findings on the particular contributory negligence which had been submitted by defendant's instruction 6. Instruction 7 contained the statement that defendant had to prove that plaintiff was guilty of "such contributory negligence."

All the evidence and all the argument of both counsel with respect to contributory negligence referred to the one question as to whether plaintiff was watching where he was walking. We must hold, therefore, that the jury could not but have understood that "such contributory negligence" referred to the contributory negligence outlined in defendant's instruction 6.

Defendant contends that plaintiff's instruction 2 (measure of damages) was erroneous because, says defendant, it authorized the recovery of double, triple, and quadruple damages. Plaintiff's damage instruction was: "The court instructs the jury that if you find the issues in favor of the plaintiff and against the defendant as submitted in other instructions herein, then it becomes your duty to assess damages against the defendant in whatever amount you may find and believe from the evidence would properly and reasonably compensate the plaintiff for any and all injuries received as a direct result of the fall mentioned in evidence.

"In arriving at the damages, if any, you may take into consideration and account the following: The nature, character and extent of the injuries, if any, received by the plaintiff; the pain, suffering and misery which plaintiff has endured and which you may find and believe from the evidence he is reasonably certain in the future to endure as a direct result of such injuries; the physical disability and impairment which you may find and believe from the evidence that plaintiff has suffered and may be reasonably certain to suffer in the future as a direct result of said injuries; such medical, hospital, doctors, nursing, X-ray bills and other services and charges as shown in evidence, which you may find and believe from the evidence, was reasonably required to treat the said injuries, if any, of plaintiff; any and all impairment of earning power and ability to work, labor and earn, if any, and all actual loss of wages and earnings as you may find and believe from the evidence the plaintiff has suffered as a direct result of said injuries;

together with any future pain, suffering and disablement which you may find and believe from the evidence it is reasonably probable plaintiff may be expected to suffer and undergo as a direct result of said injuries."

Defendant argues that if the items which are mentioned in paragraph 2 were numbered, future pain and suffering are included in items 1, 2, and 7, past disablement and impairment of earning power are included in items 1, 3, and 5, future disablement and impairment of earning power are included in items 1, 3, 5, and 8, and past loss of earnings is included in items 5 and 8; thus authorizing recovery of double, triple, and quadruple damages for the items mentioned. Plaintiff concedes that future pain and suffering were twice mentioned among the items that might be taken into account, but plaintiff contends that such inadvertence was nothing more than nonprejudicial repetition.

■ We have carefully examined the foregoing instruction. We should observe that we do not commend the use of detailed and complicated damage instructions in the usual personal injury case. That, because it usually happens that the listed items which the jury is told it may take into account are somewhat overlapping. It would appear to be better practice to leave many of the suggested items for jury argument rather than to include them in a damage instruction. The use of shorter damage instructions would obviate questions such as here raised by defendant.

■ The question here, however, is whether the instruction in the form given was prejudicially erroneous. We are of the view that it was not. The primary reason for that conclusion is that the first paragraph clearly tells the jury that it is to assess damages against the defendant in whatever amount it may find and believe from the evidence will *properly and reasonably compensate* the plaintiff *for any and all injuries received* as a direct result of the casualty. The items which follow are matters which the jury may con-

sider in assessing the damages correctly *directed* in the first paragraph. The detailed considerations in the second paragraph of the instruction would not be understood, in our view, as separate damages to be allowed in addition to the damages to be assessed by the first paragraph. They are within the allowable damage, not additions to it. Warning v. Thompson, Mo., 249 S.W.2d 335, 342 [11], 30 A.L.R.2d 1176.

An instruction in the form of the instant one should be distinguished from one like or similar to that considered in Alexander v. Kansas City Public Service Co., Mo.App., 268 S.W.2d 451, 454 [4]. There an instruction told the jury to *allow* plaintiff a sum that would fairly compensate him for the injuries he sustained and that the jury might further *allow* such sum as would fairly compensate him for aggravation of a pre-existing physical condition. Such an instruction directs the allowance of double damages because aggravation of a pre-existing injury is necessarily included within the injuries sustained by plaintiff, and it directs assessment of separate damages for aggravation. Likewise, instant instruction should be distinguished from that type of instruction which directs the jury to *assess* damages for each listed item.

Defendant relies on Murphy v. St. Louis Public Service Co., 362 Mo. 772, 779, 780, 244 S.W.2d 31, 35, 36, in which the court, in considering the damage instruction there, apparently did not take into account that it was one which, like instant instruction, had correctly stated the measure of damages and had then permitted the jury to take into account certain things in determining the amount of damages to be assessed under the direction of the first paragraph. The Murphy instruction was held erroneous, as one of two stated reasons, because it submitted double compensation "in that it allowed awards for impairment of earning capacity and for permanent injuries as separate elements of damage." 244 S.W.2d 36 [9]. At first blush it might seem sufficient to distinguish the instruction in the instant case from the one in Murphy by pointing out that instant instruction does not include specifically an authorization to consider distinct permanent injuries. But the instant instruction does authorize the jury to consider the nature, character, and extent of the injuries and the physical disablement and impairment which plaintiff had suffered and may be reasonably certain to suffer in the future. We must concede, therefore, that the Murphy case, supra, does give some support to defendant's present contention. However, we are unable to agree with the conclusion in the Murphy case, not only because of the matter heretofore mentioned, but also because if, as we have held, a permanent injury is, aside from pecuniary loss, a separate element of damages, Meierotto v. Thompson, 356 Mo. 32, 201 S.W.2d 161, then it seems clear that impairment of earning capacity, past or future, is not necessarily included in, nor does it necessarily result from, a permanent injury.

There may be, under certain constructions of the language of instant instruction 2, some overlapping of the items which the jury was authorized to consider and take into account in assessing damages but, as we view it, each of those items, except one to be noted, presents a distinct and separate facet of the total problem, and a consideration of each would reasonably go into a determination of proper compensation. As noted, plaintiff concedes that the instruction twice mentioned future pain and suffering. (There is no attack on the instruction because of the use of the words "reasonably probable" in the second submission of future pain and suffering rather than the words "reasonably certain.") Plaintiff correctly says that the fact that future pain and suffering had been repeated would be obvious to a jury. We cannot believe that because of the repetition a jury would award double damages for future pain and suffering.

Defendant contends that the trial court erred in overruling its challenges for cause of two veniremen. Again it is essential to

a clear understanding of our ruling in that respect to set forth some of the record. On voir dire venireman Gregg, in answer to questions as to whether he had ever suffered any painful or disabling condition of his lower back, disclosed that he had had a crushed disc which had been operated about a year prior to the instant trial; that he still had disability from it; that he recovered therefor under workmen's compensation through a settlement made a month prior to instant trial. He said that the fact that he had made a claim would not prejudice him against the defendant. On further examination by defendant's counsel: "Now, on this second question about the question of damages and injury, would this fact that you had had a fractured disk influence you in any way on that question? * * * I don't believe it would. * * * But, Mr. Gregg, you say that you wouldn't compare your injury and things like that and let it influence you in coming to a decision on the matter? * * * I don't believe so." On further examination by plaintiff's counsel, it apparently had been disclosed also that venireman Gregg had made a claim under a personal accident insurance policy (apparently in connection with the same back injury). Mr. Gregg stated that the accident policy claim would not prejudice him against the defendant. He further disclosed that 14 or 15 years ago he had had another back injury "and did draw some" [compensation?].

On voir dire venireman Lord said that he had sustained a cut on his face and had consulted the doctor who was to testify for defendant in the instant trial. That doctor had rated him under workmen's compensation and had testified before the Kansas Commission; that he had received an adequate settlement and nothing in the experience would prejudice him for or against the doctor in question. Mr. Lord also disclosed that he was at the time of instant trial a plaintiff in a pending damage suit growing out of a casualty occurring in November 1954 due to an automobile accident in which Lord's automobile was hit from behind. Apparently a judgment had been rendered in the circuit court, but there was some question about its collection because of the failure of the insurance carrier. He had sustained injuries to his back, neck, and shoulder. After some discussion of the matter with the venireman, counsel for defendant asked this question: "Whether or not, when you had an injury to your neck, would that have any influence on you in deciding the question of how much Mr. Moss would be entitled to? * * * Not in the slightest. * * * You mean that would not influence you at all? * * * No, sir. * * * Would the fact that you had had a suit * * * this fellow ran into the back of your car * * * there wasn't in that case any question of who was to blame * * * would that have any influence on you? * * * No, sir. It is too dissimilar. * * * you think that on this question of the injury to the neck you would make the same decision you would if you had never had an injured neck of your own? * * * I believe so. * * * You don't think it would have anything to do with it? * * * No, sir." Counsel further brought out that the injury to venireman Lord's face had resulted in a visible scar which had been compensated under workmen's compensation, and the venireman stated that he understood that there was no similarity between a case like the instant one with respect to the question of who was at fault and a claim under workmen's compensation.

In answer to questions as to whether any immediate member of his family had had claims for damages, venireman Lord disclosed that his wife some 10 years ago was injured while riding a streetcar; that she was thrown against the front of the seat and had knocked out all her front teeth; and that probably a suit had been filed and settled. Then, these questions and answers: "Would that fact that you had had that claim in your family influence you any in this case? * * * No, sir. * * * You don't think it would influence you either on the question of fault or on the question of

damages? No, sir." On further examination by plaintiff's counsel, the following: "Now, Mr. Lord, the question Mr. Dabbs asked you about these injuries that you received in these law suits, he didn't ask you, that wouldn't prejudice you against his defendant? * * * No, sir."

Defendant challenged venireman Lord for cause on the ground that while the juror had said he would not be prejudiced or influenced by the occurrences which he mentioned and might honestly so think, nevertheless, the venireman was not the judge of his own qualifications and it would be humanly impossible for one to have had those experiences without being substantially prejudiced. Defendant challenged venireman Gregg on the ground that the fact that Gregg had had a crushed disc and that instant plaintiff was claiming back injury would unquestionably influence Mr. Gregg on the question of the measure of damages. The trial court overruled both challenges. The record shows that defendant exercised two of its three peremptory challenges in eliminating from the jury Messrs. Gregg and Lord.

In the recent case of Moore v. Middlewest Freightways, Inc., Mo., 266 S.W.2d 578, we held that the trial court is vested with a "broad discretion in determining the qualifications of veniremen to sit as jurors and his rulings should not be disturbed unless they are clearly and manifestly against the evidence," 266 S.W.2d 585; that irrespective of a unanimous verdict (in the instant case there was a 9-man verdict), the fundamental right to a trial by jury includes a right to a jury of 12 impartial qualified men and a right to a decision based upon the honest deliberations of all twelve; and that "It is also fundamental that the venireman is not the judge of his own qualifications." In the Moore case we held that the trial court had abused its discretion in failing to sustain a challenge for cause. The venireman in Moore, however, admitted prejudice

against the defendant. By further questions, the venireman thought he would not be prejudiced beyond a fair and reasonable doubt; that he could not be anything but fair; and that his feeling in the respects noted would not cause him to be swayed one way or another in the particular case.

In Theobald v. St. Louis Transit Co., 191 Mo. 395, 90 S.W. 354, the juror in question had said that he had a sort of prejudice against the defendant but that he did not think it would influence his verdict but that one having a prejudice would probably unconsciously be biased. That case pointed out that it is the duty of the trial court to exercise a wise judicial discretion and come to a conclusion upon the facts stated by a juror rather than to permit the juror to decide whether he could divest himself of an admitted prejudice.

In Carroll v. United Railways Co., 157 Mo.App. 247, 137 S.W. 303, cited by instant defendant, the prospective juror admitted former prejudice against a defendant but said that he had none at the particular time. The court said that the doubt as to the qualifications of a venireman should be resolved against the one challenged and held that the examination was such that the trial court reasonably could not have found that the juror's prejudice had been dissipated.

We recognize that, as stressed by instant defendant, a venireman is not the judge of his own qualifications and that the trial court in the exercise of its discretion should resolve a substantial doubt as to the venireman's qualifications against the prospective juror. However, it is equally true that, on review by an appellate court, unless there is some fact which, we reasonably can say, in and of itself, necessarily showed prejudice, or unless there is an admission of prejudice, past or present, or unless there is something in the demeanor of the venireman which, despite his actual words, discloses the ex-

istence of prejudice in fact, we should not convict the trial court of an abuse of discretion in overruling a challenge for cause. In the instant case, both venireman said that none of their experiences would prejudice them against the defendant. We reasonably cannot hold that the matters disclosed were of the kind or nature which must of necessity have resulted in prejudice against the defendant, and we cannot on this record pass upon such matters as the demeanor of a particular venireman. Consequently, we must hold that the trial court did not abuse its discretion in overruling the challenges for cause. See Hieber v. Thompson, Mo.App., 252 S.W.2d 116, 122 [8, 9] [10].

Defendant contends the judgment is excessive. The trial court overruled an assignment to that effect in plaintiff's motion for new trial and thus we view the evidence from the standpoint most favorable to support the trial court's ruling. Prior to detailing the nature and extent of plaintiff's physical injuries, it is important in this case to preliminarily determine the amount of special damages (loss of earnings, hospital, medical, and like expenses) a jury reasonably could find plaintiff sustained.

The accident occurred March 6, 1952, and instant trial began May 9, 1955. Plaintiff was 62 at accident time and 65 at trial time. He had been for 30 years a salesman for Heller & Company, for whom he sold imitation and cultured pearls to retail stores in midwestern cities. The selling involved was "highly personalized" requiring continuous cultivation of customers over long periods of time. From 1949 until the time of the accident in 1952 plaintiff also sold merchandise for The Sperry Company which, as we understand, was a less costly line of the same type of merchandise and a line which most Heller salesmen handled. The evidence showed that plaintiff had received annual gross income from Sperry in the two years prior to his accident of approximately $6,000;

that he did not handle the Sperry account from accident time in 1952 until the last half of 1954 due to his injuries; that, accurately enough for present purposes, he thereby lost gross earnings of about $15,000. His income tax returns for the years 1950–1954, inclusive, showed that his business expense was not materially greater when handling both accounts. Defendant points out that adding lost gross income from Sperry for the years 1952, 1953, and 1954, to net income, increases the amount of income tax which plaintiff would have paid in the years in question. Consequently, plaintiff's actual loss was $9,739.22 rather than approximately $15,000. Our calculations, however, show that the actual loss would amount to approximately $10,000 and for our purposes the last mentioned figure is sufficiently accurate.

The plaintiff also estimated that but for his injuries he would have earned an additional $6,000 per year gross from Heller during the period, as we understand it, prior to the time (2½ years following the accident) when he resumed full sales operations. The record in that respect shows the following:

"Now, do you have a judgment or an estimate from your knowledge of the industry and the manner in which it was flourishing whether or not you would have made more from Heller in the remaining six months of '52 and in '53 and in '54 if you hadn't been disabled? A. Oh, definitely.

"Q. And from your judgment and knowledge of the industry how much do you estimate that to be per year? A. Per year?

"Q. Yes. A. Around $6,000.

"Q. Per year? A. Per year.

"Q. Do you consider that a minimum estimate? A. Minimum estimate.

"Q. Conservative estimate? A. Yes, sir, a conservative estimate.

"Q. Is the implication behind that that in this business from '52 on the business was on the upgrade nationally? A. *I can explain that to you.*

"Q. Yes, but is that the implication behind it? A. Yes, sir.

"Q. He may ask you to explain, and I don't care to. A. Yes, sir." (Our italics.)

■ Did the estimate of loss of anticipated gross earnings from Heller contained in the foregoing testimony ($15,000 which, by mathematical calculation, would amount to an actual loss, when additional income tax is figured, of about $10,000 for the 3-year period) constitute substantial evidence from which a jury could find loss of earnings in that amount? We think not. The burden was on plaintiff to prove loss of past earnings with some reasonable certainty—i. e., to prove the fact and amount of loss at least by the best evidence available. The record shows that plaintiff offered to state a basis for his estimate and that offer was refused by counsel. The importance of that is that failure of plaintiff to state a basis for his estimate, after indicating that there was a basis for it, amounted to a failure to adduce available evidence which might have substantiated the estimated loss. Furthermore, plaintiff's income tax returns show that the total gross income from Heller in the 2½ years in question remained about the same or more than the gross income from Heller in the two years prior to injury. Thus it becomes clear that some reasonable basis for plaintiff's estimate was imperative. Under the circumstances, we are constrained to hold that the unexplained, uncorroborated, and undemonstrated loss of earnings from Heller did not constitute substantial probative evidence from which a jury reasonably might find that plaintiff lost gross earnings from Heller at the rate of $6,000 per year; and that, even though plaintiff's estimate came into evidence without objection or without any attempt to demonstrate the

speculative or conjectural nature of it. See Ganz v. Metropolitan St. R. Co., Mo., 220 S.W. 490, 495 [1, 2] (and cases there cited). In Fishang v. Eyermann Contracting Co., 333 Mo. 874, 63 S.W.2d 30, it was held, with respect to the question of the quantum of proof necessary to establish lost earnings, that the fact that plaintiff's books "were not kept with precision and did not show the details of his business or the items from which net earnings were computed did not deprive him of the right to recover for loss of such earnings if such loss could be shown with reasonable certainty, notwithstanding the vagueness of the books." 63 S.W.2d 36. There, however, as in all the cases we have examined, there was some basis for the estimate of loss of past earnings, not just an unsupported statement as in the instant case. We do not imply that a plaintiff in a personal injury action must show with exactness the earnings which he claims to have lost, but we do hold that there must be some evidence from which a jury may find that plaintiff's estimate was approximately correct.

It is conceded that plaintiff's doctor, X-ray, nursing, hospital, and necessary transportation bills totaled $3,241.13. Consequently, in determining the question of excessiveness, it would appear that the evidence viewed most favorably to plaintiff would sustain a finding of special damages to trial time of approximately $13,250.

Immediately after the fall plaintiff was conveyed to a Kansas City hospital where he stayed for six weeks. His most serious injury, as will appear from the medical testimony, was a broken right hip. While in the hospital he suffered continuous pain in the hip, in the small of his back, and in his neck. Upon discharge from the hospital he returned to his home in New York and was there confined to bed for four weeks. Thereafter he was able to get about on crutches until September 1, 1952, and returned to work some time prior to September for an

hour or two a day, but was unable to go back "on the road" until September 7, 1952, when he, for a time, used a cane. The pain in his hip, back, and neck continued, and after he began the use of crutches his left arm became stiff and his left shoulder painful, with limitation of motion of his left arm. He was under the care of doctors in New York for both his hip injury and the disabilities in his back, neck, and left shoulder. Plaintiff testified that at trial time (3 years after the fall) he was unable to walk in excess of eight or ten blocks at a time, that his right leg becomes a "little numb," that he has to stop often and start again, that there is terrific pain in his right leg in alighting from an automobile or going up and down stairs when he needs to put weight on the right leg, that he is unable to sleep on his right side because of pain, that he is not the same person he used to be because he cannot get around as fast, that dull pain continues in his lower back, that his neck has improved but there is still pain on pressure. He further said that prior to his injury he had been in good health with no previous illnesses, accidents, or hospitalizations, and that he was an active participant in sports such as golf, swimming, badminton, and table tennis. At the time of trial he did not need a cane to assist him in walking and he did not limp.

Plaintiff's medical testimony tended to show that the fall had aggravated pre-existing arthritic conditions in the cervical and dorsal regions of his spine which caused those regions to be painful with some resultant disability; that he sustained an irregular fracture through the neck of the femur of the right limb with upward displacement of the femur shaft, a most painful and disabling condition; that to obtain the desired result it was necessary to operate on the hip and use metal (a Smith-Peterson nail and a supporting metal screw) to maintain the alignment of the involved bone; that a good result

was obtained as it appeared on plaintiff's discharge from the Kansas City hospital.

Plaintiff's Kansas City orthopedist examined him a year after the injury and found that the hip had progressed well; that plaintiff was complaining for the first time of pain in his left shoulder; and that he continued to complain of pain in his back and neck. On examination of the left shoulder, there was marked limitation on rotation and abduction of 55° and the left upper arm disclosed a ½-inch atrophy. There was tenderness in the small of the back and limitation of movement in that area in all directions. There was good movement of the right hip joint except for slight limitation on inward rotation of the thigh at the hip. There was tenderness at the operation site due to the protruding nail and the right thigh showed a ½-inch atrophy. The same doctor next saw and examined plaintiff in October 1953, at which time the plaintiff complained of pain which was associated with weakness of the right leg after use in walking. There was increased pain and stiffness in the left shoulder and plaintiff was unable to raise his arm. The left shoulder condition was diagnosed as chronic bursitis which was caused by the necessary treatment of the right hip. The back condition was unchanged. The same doctor saw plaintiff in October 1954 and found that the right hip continued to improve although plaintiff still complained of weakness and pain and of his right knee "giving way." He continued to complain of pain in the low back and neck and, while his left shoulder was better, it was still stiff and painful.

X-rays taken immediately prior to the trial showed an early localized aseptic necrosis (destruction of the bone due to the lack of blood supply) of the right femur. The evidence was that the necrotic condition apparent on the X-rays was a progressive one and would result in traumatic arthritis causing pain, limitation of motion, stiffness of the hip, and immobility; that

the metal should be removed; that the hip would grow progressively worse; that plaintiff should resume the use of crutches, with X-rays every six months for a period of one to four years; that if the progression of the necrotic condition had not then been arrested the hip would "break down" (a result in the realm of medical probability in plaintiff's case) requiring an operation to replace the head of the femur with a metal cup or a bone-grafting operation to permanently fuse the joint, either of which operations would cost about $850.

As to the prognosis for the hip condition, it was said that the appearance of the necrotic condition was a danger signal; that the patient had to be observed for an indefinite period so that special treatment could be instituted to preserve the hip as long as possible; and that a slow "downward progression" was indicated. There was also the medical opinion that the aggravation of the arthritic condition in the neck and back are permanent in that pain in those regions will remain with varying degrees of intensity throughout plaintiff's life.

Plaintiff's hip injury was and is serious, and while the prognosis for his hip bodes future trouble, and while from the testimony of impairment of his past earning capacity during the 2½ years when plaintiff was not operating at full capacity the jury reasonably could find, without speculation beyond the scope of the evidence, an impairment of future earning capacity, still the fact remains that plaintiff's income tax returns show that even during the time of plaintiff's greatest pretrial disability his gross income averaged more than $23,000 a year. It would appear that that fact must have significance when we attempt to compare the instant plaintiff's judgment with those judgments others have recovered in cases wherein the evidence showed that the main item of damage justifying those judgments was the fact that those plaintiffs were permanently disabled from doing the only thing they had spent their lifetimes doing. In other words, we must give weight to the fact that any impairment of instant plaintiff's future earning capacity will not result in the comparatively serious future financial condition as is often the case where a permanent disability has resulted to one engaged in railroading or some other type of work requiring a high degree of manual exertion.

We have, of course, read the cases cited by the parties tending to establish their respective positions as to excessiveness. We have examined other cases. It is most difficult to comply with the rule of uniformity of judgments by comparing this plaintiff's situation with others even where the physical injuries may be said to be substantially similar. That is because of the wide divergence in the other circumstances of the parties and the wide divergence in the amount of actual loss shown at trial time. Taking into account the nature and extent of plaintiff's injuries, his age, the fact that he had a monetary loss at trial time which the jury reasonably could have found amounted to $13,250, considering the unfavorable prognosis as to plaintiff's hip, and the other factors so often repeated which we do take into account, we are of the opinion that the judgment in this case is excessive in the amount of $12,500. These cases, among others, have been helpful to us in reaching the foregoing conclusion: Cruce v. Gulf, M. & O. R. Co., 361 Mo. 1138, 1149, 1150, 238 S.W.2d 674, 681, 682; Howard v. Missouri Pacific R. Co., Mo., 295 S.W.2d 68; Glowacki v. Holste, Mo., 295 S.W. 2d 135.

It follows that if plaintiff will, within fifteen days, enter here a remittitur in the sum of $12,500, a judgment for $37,500 will be affirmed as of the date of the entry of the original judgment with interest thereon from that date. Otherwise the case is reversed and remanded for a new trial.

VAN OSDOL and HOLMAN, CC., concur.

PER CURIAM.

This cause having been remanded to Division One from Court en Banc, as per stipulation on file, it is ordered and adjudged, in accord with said stipulation, that the judgment herein be affirmed for $37,500, as of this date.

All concur except DALTON, J., who dissents in memorandum opinion filed.

DALTON, Judge.

I dissent on the ground that, on the record presented, the trial court abused its discretion in failing to sustain the challenges for cause as to veniremen Lord and Gregg.